INTER ISLAND SHIPPING CORPORATION, recurrente, *v.* COMISIÓN INDUSTRIAL DE PUERTO RICO, recurrida.

*Número*: CI-63-7      *Resuelto*: 18 de diciembre de 1963

*Hartzell, Fernández & Navas,* y *A. Santiago Villalonga,* aboga-
dos de la recurrente; *Donald R. Dexter, Carmen Ana Archeval*
y *Aura Nélida Pérez,* abogados del Administrador del Fondo
del Seguro del Estado.

Sala integrada por el Juez Asociado Señor Belaval como Presi-
dente de Sala y los Jueces Asociados Señores Hernández
Matos y Santana Becerra.

EL JUEZ ASOCIADO SEÑOR BELAVAL emitió la opinión del Tribunal.

La Inter Island Shipping Corporation, una corporación
organizada de acuerdo con las Leyes de Puerto Rico, con su
oficina principal en Puerto Rico, celebró en Puerto Rico, un
contrato de trabajo con el señor Roque Rosado Claudio,
residente en Puerto Rico, mediante el cual el señor Rosado
Claudio trabajaría como marino a bordo del barco "TMT
Lloyd" en viajes desde el puerto de San Juan, Puerto Rico,
hasta Saint Thomas y Saint Croix, Islas Vírgenes, regresando
al puerto de San Juan, teniendo cada uno de estos viajes una
duración de veinticuatro a veintiséis horas, y realizando como
promedio, dos viajes a la semana.

La recurrente obtuvo del Fondo del Seguro del Estado
una póliza para accidentes de trabajo, a base del total de
sus nóminas que incluían, no sólo los salarios devengados
por sus obreros marinos y empleados en el trabajo efectuado
dentro de la Isla de Puerto Rico, sino también el trabajo

efectuado fuera de los límites territoriales de Puerto Rico durante los viajes anteriormente relacionados.

El 1ro. de septiembre de 1962 el marino Roque Rosado Claudio sufrió un accidente mientras el barco "TMT Lloyd" se encontraba anclado en aguas de Saint Thomas, Islas Vírgenes. El día 6 de septiembre de 1962, la recurrente radicó en el Fondo del Seguro del Estado de Puerto Rico un informe de accidente de trabajo. El 31 de octubre de 1962, el Administrador del Fondo del Seguro del Estado resolvió que carecía de jurisdicción para entender en el caso por haber ocurrido el accidente fuera de los límites territoriales del Estado Libre Asociado de Puerto Rico. La recurrente apeló de la decisión ante la Comisión Industrial quien dictó una resolución desestimando la apelación y confirmando la decisión del Fondo del Seguro del Estado. En esta última decisión, se sostuvo además el punto, que el patrono no tenía derecho a apelar de la decisión del Administrador, por no haber sido declarado aquel patrono no asegurado por el Administrador. Solicitada la reconsideración, ésta fue denegada.

En su revisión ante este Tribunal, la recurrente señala tres errores: (1) que el accidente de trabajo envuelto en el presente caso no estaba cubierto por la póliza del patrono; (2) que la Ley de Compensaciones por Accidentes del Trabajo nuestra no tiene efecto extraterritorial para cubrir un accidente de trabajo ocurrido a un obrero mientras está en funciones de su empleo fuera de los límites territoriales de Puerto Rico para un patrono asegurado con el Fondo del Seguro del Estado; (3) que el patrono no tiene derecho a apelar ante la Comisión Industrial de una decisión del Administrador del Fondo del Seguro del Estado en la cual dicho funcionario se niega a dar cubierta bajo la póliza del patrono a un accidente del trabajo ocurrido a un obrero de éste.

1-2—La facultad de la Asamblea Legislativa de Puerto Rico para establecer un sistema de compensación a obreros

por accidentes del trabajo ocurrido en la zona marítima de Puerto Rico y aguas adyacentes merece un poco de historia. Después de la cesión de la provincia de Puerto Rico, que hace el Gobierno de España al Gobierno de los Estados Unidos en 11 de abril de 1899, se adopta por el Congreso de Estados Unidos para regir la Isla de Puerto Rico, la Carta Orgánica del 1900, aprobada el 12 de abril de 1900, cuya Sec. 9 disponía: "Que sujeto a la aprobación del Secretario de Hacienda, dictará el Comisionado de Navegación los reglamentos que estime convenientes para la nacionalización de todos los buques que eran propiedad de habitantes de Puerto Rico el día once de abril de mil ochocientos noventa y nueve, y continuaran siéndolo hasta la fecha de dicha nacionalización, y para la admisión de los mismos a todos los beneficios del tráfico costanero de los Estados Unidos; y el cabotaje entre Puerto Rico y los Estados Unidos será regulado de acuerdo con las disposiciones de ley aplicables a dicho tráfico entre dos de cualquiera de los grandes distritos costaneros de los Estados Unidos."

Para llevar a cabo la política enunciada por el Congreso de los Estados Unidos en la Sec. 9, se adoptó el 12 de mayo de 1906, la enmienda a la Sec. 4348 de los Estatutos Revisados de Estados Unidos que dispone: "El litoral y ríos navegables de los Estados Unidos y Puerto Rico serán divididos en cinco grandes distritos: El primero incluirá todos los distritos de recaudación en las costas marítimas y ríos navegables comprendidos entre el límite norte del Estado de Maine y el límite Sur del Estado de Tejas; el segundo consistirá de la Isla de Puerto Rico; el tercero incluirá los distritos de recaudación en las costas marítimas y ríos navegables comprendidos entre el límite Sur del Estado de California y el límite Norte del Estado de Washington; el cuarto consistirá del Territorio de Alaska; el quinto consistirá del Territorio de Hawaii."

Por la Sec. 13 de la Carta Orgánica del 1900 también se disponía: "Que todas las propiedades que puedan haber adquirido en Puerto Rico los Estados Unidos por la cesión de España en dicho Tratado de Paz, en puentes públicos, casas camineras, fuerza motriz de agua, carreteras, corrientes no navegables, y los lechos de las mismas, aguas subterráneas, minas o minerales bajo la superficie de terrenos particulares y toda propiedad que al tiempo de la cesión pertenecía, bajo las leyes de España entonces en vigor, a las varias Juntas de Obras de Puerto Rico, y todas las orillas de los puertos, muelles, embarcaderos y terrenos saneados, pero sin incluir la *superficie de los puertos o aguas navegables*, por la presente quedan bajo la dirección del Gobierno establecido por esta Ley, para ser administrados a beneficio de El Pueblo de Puerto Rico; y la Asamblea Legislativa creada por la presente, tendrá autoridad para legislar respecto a todos esos asuntos, según lo estimare conveniente, con sujeción a las limitaciones impuestas a todos sus actos."

Al aprobarse la Carta Orgánica del 1917, la Sec. 13 de la Carta Orgánica del 1900 fue sustituida por los Arts. 7 y 8 de la nueva Carta que disponen: "Toda propiedad que hubiere sido adquirida en Puerto Rico por los Estados Unidos, en virtud de la cesión hecha por España en el tratado de paz celebrado el día 10 de diciembre de 1898, en puentes públicos, casas camineras, fuerza motriz de agua, carreteras, corrientes no navegables y lechos de las mismas, aguas subterráneas, minas o minerales bajo la superficie de terrenos particulares; toda propiedad que al tiempo de la cesión pertenecía, en virtud de las leyes de España entonces en vigor, a las diferentes juntas de obras de puertos de Puerto Rico; todas las orillas de los puertos, muelles, embarcaderos, terrenos saneados y todos los terrenos y edificios públicos no reservados hasta ahora por los Estados Unidos para fines públicos, quedan por la presente bajo el dominio del Gobierno de Puerto Rico, para ser administrados a beneficio del Pueblo

de Puerto Rico; y la Asamblea Legislativa de Puerto Rico tendrá autoridad, con sujeción a las limitaciones impuestas a todas sus leyes, para legislar respecto a todos esos asuntos según lo estimare conveniente; *Disponiéndose* que el Presidente podrá de tiempo en tiempo, a su discreción, traspasar al Pueblo de Puerto Rico aquellos terrenos, edificios o intereses en terrenos u otras propiedades pertenecientes en la actualidad a los Estados Unidos y dentro de los límites territoriales de Puerto Rico, que a su juicio no se necesiten ya para propósito de los Estados Unidos. Y él podrá de tiempo en tiempo aceptar de Puerto Rico, mediante concesión legislativa, cualesquiera terrenos, edificios u otros intereses o propiedades que fueren necesarios a los Estados Unidos para fines públicos." (Art. 7.)

"La superficie de los puertos y los cursos y extensiones de aguas navegables y los terrenos sumergidos bajo ellos dentro y alrededor de la Isla de Puerto Rico y de las islas y aguas adyacentes que ahora pertenecen a los Estados Unidos y no han sido reservados por los Estados Unidos para fines públicos, quedan por la presente colocados bajo el dominio del Gobierno de Puerto Rico, para que sean administrados de la misma manera y con sujeción a las mismas limitaciones que las propiedades enumeradas en el artículo precedente; *Disponiéndose*, que todas las leyes de los Estados Unidos para la protección y mejoramiento de las aguas navegables de los Estados Unidos y para la conservación de los intereses de la navegación y del comercio, serán aplicables a dicha isla y aguas y a sus islas y aguas adyacentes, excepto en aquello en que las mismas sean localmente inaplicables; *Disponiéndose, además*, que nada de lo contenido en esta Ley se interpretará en el sentido de afectar o menoscabar de ningún modo los términos o condiciones de cualesquiera autorizaciones, permisos y otras facultades concedidos legalmente hasta ahora por el Secretario de la Guerra u otro funcionario o agente autorizado de los Estados Unidos en o

en relación con dichas aguas y terrenos sumergidos en y alrededor de dicha isla y de sus islas adyacentes, o hasta este momento ejercidos legalmente en o en relación con las mismas aguas y terrenos; y *Disponiéndose, además,* que la Ley del Congreso aprobada en 11 de junio de 1906, y titulada 'Ley concediendo poder al Secretario de la Guerra, bajo ciertas restricciones, para que autorice la construcción, extensión y sostenimiento de muelles, embarcaderos y otras obras sobre terrenos bajo superficies de puertos en ríos y aguas navegables, dentro o alrededor de Puerto Rico y sus islas adyacentes' y todas las demás leyes y partes de leyes que estén en contradicción con este artículo, quedan por la presente derogadas". (Art. 8.) Como se ve, la autoridad de la Asamblea Legislativa de Puerto Rico para establecer un sistema de compensación a obreros por accidentes de trabajo en la zona marítima, deriva del Art. 8 de la Carta Orgánica del 1917, dejado en vigor por la Ley de Relaciones Federales del 1950. Como el estado de derecho que se origina de la posible colisión entre las leyes federales de almirantazgo y compensación marítima y nuestra Ley de Compensaciones por Accidentes del Trabajo requiere la exposición de la legislación federal y la jurisprudencia aplicable, intentaremos una breve síntesis de dicho instituto.

La autoridad del Congreso de los Estados Unidos para establecer un sistema de compensación por daños marítimos, deriva de la Sec. 2 del Art. III de la Constitución de los Estados Unidos de América que dispone: "El poder judicial se extenderá a todos los casos de almirantazgo y jurisdicción marítima" concordada con la disposición de la Sec. 8 del Art. I de la misma Constitución que dispone: "El Congreso tendrá facultad . . . para aprobar todas las leyes que fueran necesarias y convenientes para poner en práctica todas aquellas (facultades) que en virtud de esta Constitución puedan estar investidas en el Gobierno de los Estados Unidos o en cualquiera de sus departamentos o funcionarios."

En virtud de esta autoridad, el Congreso adoptó el 22 de abril de 1908, una Ley fijando la Responsabilidad de los Patronos Federales (*Federal Employers' Liability Act*) que se refería específicamente a los portadores públicos dedicados al comercio interestatal por ferrocarril, cuya constitucionalidad fue sostenida. Esta ley se trató de aplicar a los trabajadores marítimos y la Corte Suprema de Estados Unidos no lo permitió. El 4 de marzo de 1915 se adoptó la Ley Jones, concediéndole a los marineros (*seamen*) una causa de acción parecida a la que se le había otorgado a los empleados de ferrocarriles y su constitucionalidad fue sostenida.

A pesar de que las disposiciones de la Constitución de los Estados Unidos que hemos acotado, dejan en manos del Congreso toda cuestión relativa a almirantazgo y compensación marítima, algunos estados trataron de adoptar leyes de compensación a obreros marítimos. Una ley del Estado de Nueva York de 1914 produjo la primera decisión importante de la Corte Suprema de Estados Unidos sobre el caso que ahora nos ocupa: *Southern Pacific Company* v. *Jensen*, 244 U.S. 205, 61 L.Ed. 1086 (McReynolds) (1917), cita precisa a las págs. 215 U.S., 1098 L.Ed. El caso de *Jensen* estableció el principio que cualquier legislación estadual sobre compensación marítima contravendría el propósito de la Constitución de mantener dentro de la mayor armonía y uniformidad toda la legislación marítima, tanto la que se refiere a relaciones internacionales como a relaciones interestatales. En vista de dicha decisión el Congreso decidió enmendar la Sec. 9 del Código Judicial de Estados Unidos del 1789, añadiéndole a la cláusula de salvedad en cuanto a los remedios bajo el Derecho común (*saving to suitors clause*) los remedios concedidos por las leyes estatales sobre compensación a obreros marítimos. Dicha enmienda por adición fue declarada inconstitucional en el caso de *Knickerbocker Ice Co.* v. *Stewart*, 253 U.S. 149, 64 L.Ed. 834 (McReynolds) (1920), cita precisa a las págs. 160–166 U.S., 839–841 L.Ed. El caso de

*Knickerbocker* estableció el principio que si bien la Sec. 9 del Código Judicial le había dado facultad a las cortes de distrito de los Estados Unidos para conocer de todas las acciones civiles en almirantazgo y jurisdicción marítima, el Congreso se había excedido en su autoridad, al incluir entre dichas acciones las derivadas de las leyes de compensaciones a obreros marítimos de los diversos estados ya que el Congreso no podía transferir su poder legislativo a los estados porque dicho poder, por su naturaleza, es indelegable.

Otra vez el Congreso intentó, en el 1922, legitimar la compensación marítima estatal, añadiéndole a la cláusula de salvedad, el derecho a reclamar compensación "por daños o muerte de cualesquiera otras personas que no fueran el capitán (*master*) o miembros de la tripulación (*crew*) de un buque por sus derechos y remedios bajo la ley de compensación obrera de cualquier Estado". Dicha enmienda por adición también fue declarada inconstitucional en el caso de *State of Washington* v. *Dawson S. Co.*, 264 U.S. 219, 68 L.Ed. 646, (McReynolds) (1924), cita precisa a las págs. 225–227 U.S., 651–653 L.Ed. En el caso de *Dawson*, la Corte Suprema de los Estados Unidos trató de deshacer el nudo gordiano, advirtiendo: "Sin duda, el Congreso tiene poder para alterar, enmendar o revisar la Ley marítima por estatutos de aplicación general que le den cuerpo a su voluntad y buen juicio. Este poder, pensamos, permitiría la promulgación de una ley general sobre la responsabilidad de los patronos o disposiciones generales de compensación a empleados lesionados pero no podría ser delegado a algunos estados. La cuestión es una nacional. Los intereses locales deben rendirse al bienestar común. La Constitución es suprema." De esta indicación judicial nació la Ley de Compensación para los Trabajadores de Muelle y Obreros Portuarios—Longshoremen's and Harbor Worker's Compensation Act—aprobada por el Congreso de los Estados Unidos en el 1927.

De manera, pues, que en el mosaico de las leyes federales aplicables a la compensación marítima que puedan tener alguna relación con nosotros tenemos que destacar la Ley Jones de 1915 y la Ley de Compensación para los Trabajadores de Muelle y Obreros Portuarios de 1927. Un estudio de las distintas leyes aplicables a otros riesgos o daños marítimos o cuasi marítimos, pasajeros, visitantes, etc., está hecho en el texto de Norris—*Maritime Personal Injuries*—(edición de Baker, Voorhis & Co. Inc. de 1959). La moderada aplicación que hasta ahora hemos hecho del método histórico-evolutivo es con el objeto de situar en su verdadera atmósfera las decisiones judiciales aplicables a Puerto Rico, que detallaremos a continuación:

El primer caso que reconoce la facultad de la Asamblea Legislativa de Puerto Rico de acuerdo con la Carta Orgánica de 1917 para adoptar un sistema de compensación obrera en nuestra zona marítima, es el caso de *Lastra* v. *New York & Porto Rico S.S. Co.*, 2 F.2d 812 (Anderson) (1924), cita precisa a las págs. 813–814. En dicho caso se hacen los siguientes pronunciamientos: (1) Que no habiéndose incorporado Puerto Rico a Estados Unidos, la Constitución de los Estados Unidos de América no rige en Puerto Rico por su propia virtualidad—*ex propio vigore*—; (2) que no habiendo el Congreso dispuesto de manera expresa, que las disposiciones de almirantazgo de la Constitución de los Estados Unidos, regirían en Puerto Rico, dichas disposiciones no rigen en Puerto Rico, en la misma forma que las disposiciones sobre uniformidad de la Sec. 8 del Art. I de la Constitución de los Estados Unidos relativas a contribuciones, derechos, impuestos y arbitrios no rigen en Puerto Rico, citando el caso de *Downes* v. *Bidwell*, 182 U.S. 244, 45 L.Ed. 1088 (Brown) (1901); (3) que los Arts. 7 y 8 de la Carta Orgánica del 1917 le conceden a la Asamblea Legislativa de Puerto Rico un poder legislativo general sobre las aguas navegables de Puerto Rico; (4) que el hecho de haberse es-

tablecido en Puerto Rico una Corte de Distrito de los Estados Unidos que puede entender en casos de almirantazgo y jurisdicción marítima, no implica que el Congreso de los Estados Unidos haya extendido a Puerto Rico el instituto sustantivo y los remedios de las disposiciones sobre almirantazgo y jurisdicción marítima contenidas en la Constitución de los Estados Unidos y que dos hechos contemporáneos, como lo fueron las enmiendas por adición al Código Judicial del 1789, anteriormente analizadas, demuestran el interés del Congreso en sostener las legislaciones estatales sobre compensación obrera en la zona marítima.

Sobre el desenvolvimiento de la doctrina de la vigencia o no vigencia de la Constitución de los Estados Unidos en Puerto Rico, véase: el Art. 2 de la Ley de Relaciones Federales de 1950 en cuanto al inciso 1ro. de la Sec. 2 del Art. IV de la Constitución de los Estados referente a los derechos, privilegios e inmunidades de los ciudadanos de los Estados Unidos en Puerto Rico; *Mora* v. *Mejías*, 206 F.2d 377 (Magruder) (1953), cita precisa a las págs. 382 y 386–388 referente a la cláusula del debido proceso de ley: *Figueroa* v. *People of Puerto Rico*, 232 F.2d 615 (Magruder) (1956), cita precisa a la pág. 619 referente a la cláusula del debido proceso de ley;—véase además sobre este último extremo *Balzac* v. *Porto Rico*, 258 U.S. 298, 66 L.Ed. 627 (Taft) (1922), cita precisa a las págs. 312–313 U.S., 634 L.Ed.; *Detres* v. *Lions Building Corporation*, 234 F.2d 596 (Swaim) (1956), cita precisa a la pág. 600 referente a la diversidad de ciudadanía de los naturales de Puerto Rico en cuanto al significado de dicha diversidad dentro del Código federal de procedimiento civil.

Bajo la autoridad del caso de *Lastra* se falló por este Tribunal en caso de *United P.R. Sugar Co. (of P.R.)* v. *Corte*, 44 D.P.R. 930 (Wolf) (1933), cita precisa a las págs. 932–933 por el cual se le concedió compensación a un marinero que murió en una lancha de su patrono a poca distancia del puerto

de Humacao. Este Tribunal se negó a aplicar la Ley Jones y aplicó nuestra Ley de Indemnizaciones por Accidentes del Trabajo, siguiendo el razonamiento del caso de *Lastra*.

En la segunda decisión emitida por la Corte de Apelaciones del Primer Circuito, *Guerrido* v. *Alcoa Steamship Co.*, 234 F.2d 349 (Maris) (1956), cita precisa a las págs. 352–355, en el caso de un estibador de muelles (*longshoreman*) contratado por una compañía estibadora (*stevedoring company*), de la cual la demandada Alcoa Steamship Co. resultaba ser un mero fletador (*charterer*), algunos de los pronunciamientos del caso de *Lastra* fueron sustancialmente modificados, pero, la autoridad de la Asamblea Legislativa de Puerto Rico para adoptar un sistema de compensación obrera en nuestra zona marítima fue sostenida. En el caso de *Guerrido* se hacen las siguientes aclaraciones: (1) Que no siendo Puerto Rico un estado de la unión ni un territorio que haya sido incorporado a la unión como un paso preliminar a la estadidad, es cierto que todas las disposiciones de la Constitución de los Estados Unidos no rigen necesariamente en Puerto Rico, pero bajo la misma Constitución, el Congreso de los Estados Unidos tenía facultad para extender a Puerto Rico mediante la Carta Orgánica de Puerto Rico del 1900 la ley marítima que regía a los Estados Unidos; que habiéndose en la Ley de 1906 incluido a Puerto Rico entre los seis grandes distritos para el comercio doméstico era evidente la intención del Congreso de mantener una ley marítima uniforme tanto para los estados, como para los territorios incorporados y los territorios no destinados a la incorporación; (2) que la Carta Orgánica del 1900, al retener bajo el dominio de los Estados Unidos, las aguas navegables de Puerto Rico, como cuestión de realidad, había extendido hasta Puerto Rico las leyes marítimas de los Estados Unidos (*that the general rules of maritime law as understood in the United States followed the flag to Puerto Rican waters*); (3) que si bien los Arts. 7 y 8 de la Carta Orgánica del 1917 habían puesto

bajo el dominio de la Asamblea Legislativa de Puerto Rico las aguas navegables de Puerto Rico, dicha facultad tiene que ser interpretada de acuerdo con el anterior estado de derecho creado por el Congreso de los Estados Unidos, debiendo concluirse: "que las reglas de almirantazgo y ley marítima de los Estados Unidos están al presente en vigor en las aguas navegables de los Estados Unidos en y alrededor de la Isla de Puerto Rico hasta el punto que no sean localmente inaplicables, bien porque no fueran destinadas a aplicarse a las aguas de Puerto Rico o porque se han hecho inaplicables a estas aguas por legislación de Puerto Rico inconsistente con las mismas". (4) que la Ley de Compensaciones por Accidentes del Trabajo de Puerto Rico cubre los trabajadores marítimos, hasta el punto que no haya sido sobreseída (*superseded*) en cuanto a una clase de trabajadores marítimos por una legislación para compensaciones adoptada por el Congreso con la intención de aplicarla a todas las aguas navegables de los Estados Unidos.

◼ En la tercera decisión emitida por la Corte de Apelaciones del Primer Circuito, *Fonseca* v. *Prann*, 282 F.2d 153, (Woodbury) (1960), cita precisa a las págs. 155–157, en el caso de unos marineros y miembros de la tripulación de un barco propiedad del patrono que los contrató, algunos de los pronunciamientos del caso de *Guerrido* fueron, si no modificados, por lo menos, debidamente aclarados. Veamos: (1) "Que cualquiera que pueda ser el actual *status* del Estado Libre Asociado de Puerto Rico (*Commonwealth*) en todos sus detalles, su *status* actual no es, ciertamente, aquel de un estado de los Estados Unidos. Ni siquiera aquel de un territorio incorporado que se prepara para la estadidad . . . Como tal, el Gobierno de Puerto Rico, tiene aquellos poderes que el Congreso, de tiempo en tiempo, considere apropiado otorgarle . . . Que el ancho poder del Congreso bajo el Artículo IV Sección 2 [Constitución de los Estados Unidos de América] para legislar sobre los territorios na-

cionales está limitado solamente, bajo la doctrina de los llamados casos insulares (*Insular cases*), a ciertos principios constitucionales fundamentales" (según hemos visto, a violaciones del debido proceso de ley) ; que no hay ningún principio constitucional fundamental que le prohiba al Congreso darle a Puerto Rico autoridad sobre sus propias aguas; (2) que de acuerdo con la conclusión del caso de *Lastra*, seguida en el caso de *Guerrido*, las Secs. 7, 8 y 37 de la carta Orgánica del 1917, que están aún en vigor como formando parte de la Ley de Relaciones Federales, le dan a la Asamblea Legislativa de Puerto Rico un poder legislativo general sobre las aguas de Puerto Rico; (3) que si bien es verdad que la Ley Jones o la ley marítima general sobre los daños relacionados con barcos innavegables (*unseaworthiness*), Ley de Compensación para los Trabajadores de Muelle y Obreros Portuarios de 1927, no son inherentemente inaplicables en Puerto Rico, nada hay en dichas leyes que específicamente hagan aplicables sus disposiciones a Puerto Rico, por lo que debe seguirse el principio de los casos *Lastra* y de *Guerrido* que la Asamblea Legislativa de Puerto Rico tiene poder para adoptar la Legislación inconsistente con la Ley Jones y la ley marítima general antes descrita: (4) que la Asamblea Legislativa de Puerto Rico ha ejercitado dicho poder al aprobar la Ley de Compensaciones por Accidentes del Trabajo.

La doctrina sentada en el caso de *Fonseca* tiene la autoridad adicional de haberse denegado por la Corte Suprema de Estados Unidos el auto de *certiorari* que se solicitó para obtener su revisión: *Fermín Fonseca Flores* v. *Robert R. Prann*, 365 U.S. 860, 5 L.Ed.2d 822.

En la cuarta decisión emitida por la Corte de Apelaciones del Primer Circuito, *Waterman Steamship Corporation* v. *Rodríguez*, 290 F.2d 175 (Maris) (1961), cita precisa a las págs. 179–180, el caso de un estibador de muelles (*longshoreman*) contratado por una compañía estibadora (*stevedoring*) para descargar un barco sin condiciones

marineras (*unseaworthiness*) que no pertenecía a su patrono, se hicieron las siguientes ratificaciones y aclaraciones en cuanto a los casos anteriores: (1) que, según se estableció en el caso de *Guerrido*, "las reglas de almirantazgo y la ley marítima de Estados Unidos están al presente en vigor en las aguas navegables de Estados Unidos en y alrededor de Puerto Rico hasta el punto que no sean localmente inaplicables bien porque no fueron destinadas a aplicarse a las aguas de Puerto Rico o porque se han hecho inaplicables a estas aguas por legislación de Puerto Rico inconsistente con las mismas"; (2) que según se estableció en el caso de *Fonseca*, la Ley de Compensaciones por Accidentes del Trabajo de Puerto Rico ha hecho la ley marítima general sobre barcos innavegables (*unseaworthiness*) inaplicables a las aguas de Puerto Rico en cuanto a reclamaciones por marinos (*seamen*) lesionados contra sus patronos; (3) que como se estableció en el caso de *Guerrido*, la ley marítima general de los Estados Unidos sobre barcos innavegables (*unseaworthiness*) ha llegado a ser aplicable a las aguas de Puerto Rico sin una disposición expresa del Congreso sobre el particular, pero sujeta a ser sobreseída en todo o en parte por la legislación puertorriqueña.

Como se ve, la conclusión de la Corte de Apelaciones del Primer Circuito, parece ser, que si bien la Ley Orgánica del 1917 le dio al Gobierno de Puerto Rico el dominio sobre sus aguas navegables, en ausencia de una legislación puertorriqueña al efecto, las leyes de almirantazgo y la ley marítima general de los Estados Unidos rigen en Puerto Rico hasta el momento mismo en que puedan ser sobreseídas por cualquier legislación puertorriqueña inconsistente, como es nuestra Ley de Compensaciones por Accidentes del Trabajo, puesto que el "espacio vacío" está cubierto por las anteriores disposiciones de la Ley Orgánica del 1900.

De todos modos, por la deferencia que nos merece la jurisprudencia de la Corte de Apelaciones del Primer Cir-

cuito, trataremos de determinar si este caso caería dentro de las reglas de almirantazgo. Existiendo una clara diferencia entre un daño marítimo culposo (*maritime tort*) y un daño sin culpa implícita como es el que produce un accidente del trabajo, es indudable que la regla de almirantazgo que nos obligaría a contrastar la ley del sitio donde se cometió el delito,—*lex loci delicti commissi*—con la ley de nuestro foro, no sería aplicable a este caso. Los hechos demuestran que el obrero que sufrió el accidente bajó a tierra a comprar unos objetos personales y es al regresar al barco que se cae por la escala tendida entre el barco y el muelle. Tampoco existe cuestión litigiosa alguna en cuanto al sitio donde se firma el contrato—*lex loci contractus*—pues la responsabilidad de la póliza trata de hacerse valer en el mismo sitio en que fuera expedida. En cuanto a la nacionalidad del dueño del barco, no hay duda que el barco pertenece a una corporación organizada de acuerdo con las Leyes de Puerto Rico. En cuanto al sitio donde se expidió su carta de navegación (*flag-state*), si bien el barco tenía matrícula panameña, no nos sentiríamos obligados a aplicar cualquier disposición de la ley panameña sobre el particular. Parece que Panamá tiene una ley que hace obligatoria la sumisión al foro panameño en toda reclamación contra el dueño del barco. Como la legislación panameña favorece más al dueño del barco que al trabajador marítimo son muchos los armadores que tratan de obtener su carta de navegación en Panamá. La Corte Suprema de los Estados Unidos se ha negado a reconocer esta supremacía del instituto panameño frente a las compensaciones más favorables de los estados norteamericanos: *Lauritzen* v. *Larsen*, 345 U.S. 571, 97 L.Ed. 1254 (Jackson) (1953), cita precisa a las págs. 590 U.S., 1272 L.Ed.; además no se trata en este caso de la reclamación de un marinero contra el dueño del barco. Al tratarse de un accidente ocurrido en el puerto de Saint Thomas, tampoco debemos considerar la inaccesibilidad del foro extranjero (*foreign forum*) que algunas veces busca su mejor

resolución en las cortes de almirantazgo. Como cuestión de realidad, si tuviéramos que aplicar algunos de los "usos marítimos" patrimoniales de la Isla de Puerto Rico, reconocidos como lo están por la propia ley de almirantazgo, el mar que separa nuestra Isla de las Islas Vírgenes siempre se ha considerado un "lago puertorriqueño"; con relación a la *lex forum* no se trata en este caso de imponerle la Ley de Islas Vírgenes—un territorio no incorporado—a un organismo cuasi judicial de Puerto Rico, o viceversa, ni determinar cuál de las dos leyes, al resultar más beneficiosa, podría ayudar mejor a crear la atmósfera de aprecio que tratan de fomentar los países marítimos (*forbearance*) en evitación de represalias (*retaliation*) contra sus propias tripulaciones.

■ En cuanto a si serían aplicables a este caso la Ley Jones o la Ley de Compensación para los Trabajadores de Muelle y Obreros Portuarios de 1927 del Congreso de los Estados Unidos, la doctrina del caso de *Fonseca* v. *Prann*, supra, que aplicaremos como regla local nuestra en este caso, nos convence que dichas leyes no serían aplicables ante nuestra Ley de Compensaciones por Accidentes del Trabajo.

Hemos llegado a la conclusión que en un caso como éste, un simple caso de inclusión (*coverage*) dentro de una póliza obrera, debemos adoptar el criterio práctico que siguió la Corte Suprema de Estados Unidos en los casos de *Cudahy Packing Co.* v. *Parramore*, 263 U.S. 418, 68 L.Ed. 366 (Sutherland) (1923), cita precisa a las págs. 423–424 U.S., 369 L.Ed. y *Bradford Electric Light Co.* v. *Clapper*, 286 U.S. 145, 76 L.Ed. 1026 (Brandeis) (1932), cita precisa a las págs. 157–158 U.S., 1034 L.Ed. y decidir que este caso gira en torno a una simple relación de patrono-obrero, y dicha relación crea un *status* definido que no se altera por el hecho que el accidente ocurriera fuera de los límites territoriales, pudiendo ser reconocido por el Estado donde se creó la relación laboral. El caso que un estado compense un accidente ocurrido en otro estado o nación no resulta tan desacostumbrado como parece

—*Biggs* v. *Theis*, 369 P.2d 32 (Castles) (1942), cita precisa a la pág. 35. En el caso de *Saunders*, 136 Atl. 722 (Wilson) (1927), cita precisa a la pág. 723, un obrero empleado en Maine y cubierto por la Ley de Compensación Obrera de dicho estado, se le compensó por un accidente que sufriera en Canadá, país a donde fue a trabajar por órdenes de su patrono. El caso de *Saunders* ha sido citado con aprobación en el caso de *Lynch*, 183 N.Y. 834 (Crosby) (1933), cita precisa a la pág. 835; véase además *Cullamore* v. *Groneweg & Schoentgen Co.*, 257 N.W. 561 (Stevens) (1934), cita precisa a la pág. 563; *Hilding* v. *Department of Labor and Industries*, 298 Pac. 321 (Beeler) (1931), cita precisa a la pág. 323; *In re Byrne*, 86 P.2d 1095 (Riner) (1939), cita precisa a la pág. 1098.

▮ La Comisión Industrial al declararse sin jurisdicción en este caso, aplicó el criterio que nuestra Ley de Compensaciones por Accidentes del Trabajo no cubría un accidente ocurrido fuera de los límites territoriales nuestros. No se discute el hecho que al patrono en este caso se le cobraron primas también calculadas sobre los salarios pagados a la tripulación marítima del patrono cuando trabajaba fuera de Puerto Rico. No se discute la autoridad de la Asamblea Legislativa de Puerto Rico en cuanto a proveerle beneficios médicos y de hospitalización a nuestros obreros migrantes que se lesionan fuera de Puerto Rico si regresan a nuestro país—Ley Núm. 77 de 23 de junio de 1958. Hay indicaciones que los beneficios de nuestra compensación obrera le ha sido extendida a algunos funcionarios nuestros llamados a prestar servicios fuera de Puerto Rico por accidentes sufridos fuera de nuestro territorio. El concepto de "extraterritorialidad", lleva implícito en sí mismo, la invasión a la soberanía jurídica de otro estado, pueblo o cuerpo político. Cuando no se produce esa invasión, difícilmente puede considerarse que a la aplicación de una ley se le ha dado efecto extraterritorial.

■ Estamos conformes con la aseveración de la peticionaria que el hecho de declararse sin jurisdicción el Administrador del Fondo del Seguro del Estado equivale a declarar a la peticionaria un patrono no asegurado.

*Debe revocarse la resolución de la Comisión Industrial.*