**386**

## LUGO v. SUAZO.
### No. 2619.

Circuit Court of Appeals, First Circuit.
June 7, 1932.

Major Fred W. Llewellyn, of Washington, D. C. (Col. William Cattron Rigby and Gen. Blanton Winship, both of Washington, D. C., and James R. Beverley, Atty. Gen., on the brief), for appellant.

Leonard Wheeler, Jr., of Boston, Mass. (Goodwin, Procter & Hoar, of Boston, Mass., and Juan B. Soto, of San Juan, Puerto Rico, on the brief), for appellee.

Before BINGHAM, WILSON, and MORTON, Circuit Judges.

BINGHAM, Circuit Judge.

The principal question in this case is whether the Puerto Rican Act of 1928 (No. 19) regulating the sale of foreign coffee can be supported as a valid inspection law or is to be regarded as imposing an internal revenue tax discriminating against foreign coffee after it has been brought into the island for sale, in violation of section 3 of the Organic Act of Puerto Rico, as amended (48 USCA §§ 741, 741a, 745).

The act of 1928 requires all persons dealing in foreign coffee (coffee not grown and harvested in Puerto Rico) to obtain licenses and pay license fees of $80 per year for wholesale dealers, $20 a year for retail dealers, and like sums for their agents; to attach stamps to containers of foreign coffee at the rate of 2 cents per pound; and to keep books containing entries of all their dealings, including where the coffee comes from and where it is to go, and attach to each book a stamp of fifty cents. The title of the act reads: "To regulate the sale of foreign coffee, whether pure or mixed with Porto Rican coffee, and to provide funds to defray the expenses of such regulation, and for other purposes."

Section 23 of the act provides:

"Section 23.—The *entire proceeds* of the sale of the seals or stamps, and of the licenses and fines provided for in this Act, shall be covered into the Insular Treasury and shall constitute a special fund which shall be known as 'Coffee Protection Fund,' which shall be devoted to defraying the expenses occasioned by the enforcement of the laws for the *protection of Porto Rican coffee* and for inspecting and *guaranteeing the origin thereof.*"

Although by the title of the act the funds raised are to defray the expenses of regulating the sale of foreign coffee, section 23 states that the entire proceeds derived from the sale of stamps, licenses, and fines shall be covered into the Insular Treasury and be known as "Coffee protection fund," which "shall be devoted to defraying the expenses

occasioned by the enforcement of the laws for the protection of Porto Rican coffee and for inspecting and guaranteeing the origin thereof." It is thus apparent, if the language of section 23 is to be given its plain meaning, that the fees collected under the act of 1928 are to be devoted entirely to defraying expenses occasioned in the enforcement of laws for the protection, inspection, and guaranteeing the origin of Puerto Rican coffee; and that, if any effect can be given to the title of the act of 1928 wherein it says, "and to provide funds to defray the expenses of such regulation," such purpose was but an incident of the main purpose stated in section 23.

At the time the act of 1928 was enacted there was and still is in existence in Puerto Rico Act No. 22, of June 5, 1925, entitled "An Act to amend 'An Act to *guarantee* the origin of Porto Rican coffee', approved November 23, 1917, and for other purposes." That act of 1925 related to coffee produced entirely in Puerto Rico and provided that straps or stamps of the value of 3 cents should be attached to containers of such coffee holding from twenty-five to one hundred pounds, and straps or stamps of the value of 5 cents to containers of such coffee holding from one to two hundred pounds; and the proceeds derived from the sale of the straps or stamps provided for under the act were to be "devoted to the payment of such expenses as may arise by reason of the application of this Act." The act of 1925 is undoubtedly the law the enforcement of which was contemplated by section 23 providing for the expenditure of the funds raised under the act of 1928.

In Foote & Co. v. Maryland, 232 U. S. 494, 34 S. Ct. 377, 379, 58 L. Ed. 698, the Supreme Court had under consideration the validity of an oyster inspection law which provided "for an inspection fee of 1 cent per bushel to be 'levied to help pay the salary of the inspectors and the other expenses of the State Fishery Force.'" Besides inspection the Fishery Force had other duties imposed upon it by the act. "That organization * * * [was] supplied with men and boats, and required to patrol, day and night, the waters of Chesapeake bay to prevent unlicensed boats from taking oysters [and all boats] from improper tonging or dredging, and to see that shells and culls * * * [were] returned to the natural beds,—provisions intended for the preservation of the supply rather than determining the merchantable quality of oysters offered for sale," showing that "inspection, policing, and business expenses * * * [were] to be paid for out of

inspection fees." **In speaking of** this matter the court said:

"As the act itself makes a clear distinction between inspection expenses 'and other expenses,' the question at once arises as to whether the state did not provide for the collection of more than was 'absolutely necessary for executing its inspection laws,' thereby rendering the statute void because it included the cost of 'something beyond legitimate inspection to determine quality and condition.' Brimmer v. Rebman, 138 U. S. 83, 11 S. Ct. 213, 34 L. Ed. 862, 3 Inters. Com. Rep. 485."

In discussing the question whether the fees authorized by the act were more than necessary for executing its inspection provisions, the court laid down two preliminary propositions which were in substance as follows: (1) That where the Legislature in a so-called inspection act fixes the fees to cover the expense of inspection and provides that the same shall be devoted to that purpose, the presumption is that the fees fixed are reasonable and the burden of showing them unreasonable is upon him who asserts the invalidity of the act; but (2) where the Legislature in such an act directs the inspection fees there provided for shall be devoted to defraying "other expenses" as well as those for the inspection provided for in the act, the presumption is that the fees fixed are unreasonable, and the burden is on him who affirms the validity of the act.

In that case the statute then before the court was the re-enactment of an old law levying the same charge of one cent per bushel for inspection and the other expenses of the state fishery force. Under the operations of the old law, it appeared that the revenue produced by it was $40,000, one-third of which was sufficient to pay the salaries of the inspectors, the other two-thirds being used to pay the "other expenses of the Fishery Force." It did not, however, appear what revenue was produced under the operation of the new statute, but the court held that in the light of the operation of the previous act the failure to show that the amount collected under the new, would not be more than was necessary for the expenses of inspection proper, the present statute was void as imposing an undue burden or tax on interstate commerce. See, also, Foote & Co. v. Clagett, 116 Md. 228, 81 A. 511. The difference between that case and the one here in question (if the act of 1928 can be called an inspection law) is that in that case the "other expenses" required to be paid out of the

inspection fees arose out of duties imposed by the inspection act itself and not out of duties imposed by a different act (in this case the act of 1925), which is a difference in form only and not in substance.

█ Applying the principle laid down in the Foote Case, the fund raised by the act of 1928 is presumptively more than is necessary to defray the expenses of its enforcement and is in the nature of a tax, for the act provides that the fund shall be used to pay other expenses than those of inspection, and the government introduced no evidence showing that the fund was not in fact more than was reasonably necessary for inspection.

Our attention, however, is called to certain matters from which it may be inferred that the sum derived from the collection of these fees was in fact more than was reasonably necessary to cover the enforcement of the act of 1928. It appears from Act No. 4 of the Legislature of Puerto Rico of April 9, 1930, that on that date, the act of 1928 having been in force a year and three months, of the funds then raised thereunder there was in existence and on hand "a present balance" and it was anticipated that by June 30, 1930, there would then be an additional or "resulting balance," and that the Legislature of Puerto Rico in the Act of April 9, 1930, appropriated "the present balance and the resulting balance," not for expenses incurred in the enforcement of the act of 1928, but "for the promotion of agriculture and of rural education in the coffee zones of the island, through the establishment of experimental and demonstration farms; and for the promotion of agriculture in cooperation with the Agrarian Units under the Department of Agriculture and Labor; and with the Second Rural Units under the Department of Education." In other words, it appears from the Act of April 9, 1930, that "the present balance and the resulting balance" from the proceeds of the act of 1928 were more than were necessary for the enforcement of that act and were appropriated by the Legislature for use "in the establishment of experimental and demonstration farms" and for "the promotion of agriculture and of rural education in the coffee zones of the Island." It can hardly be believed that the Legislature of Puerto Rico, on April 9, 1930, would have gone to the trouble of appropriating these balances to the establishment of experimental and demonstration farms in the coffee zones of the Island had they not been of a substantial character and in no way needed for carrying the provisions of the act of 1928 into effect.

Then again it appears that from June 30, 1930, to June 30, 1931, the fees collected under the act of 1928 had reached a substantial sum over and above what was reasonably necessary to meet the enforcement expenses of the act of 1928 during that period of time, for, by Act No. 39, of 1931, the Legislature of Puerto Rico having ascertained that during this period there was a balance on hand of the fund created by the act of 1928 "after covering the expenses for inspection and supervision required by said Act," then transferred the same to the insular revenues "in order to cover any deficit there may be in the budget of general expenditures of the Insular Government for the fiscal year 1930–31."

In this situation it cannot reasonably be doubted that the funds derived under the act of 1928 were more than was necessary for the enforcement of its provisions for the year preceding June 30, 1930, and also for the year preceding June 30, 1931, when the Legislature on April 24, 1931 (Act No. 39), saw fit for the second time to give its attention to these funds and then provided that the balance on hand, after covering the expense of inspection and supervision required by the act of 1928, should be turned over to the insular revenue to cover any deficit of the insular government for the year 1930–31. The funds derived from the act of 1928 were, therefore, not only presumptively excessive, but we think, under the circumstances here shown, were so in fact.

The charge collected under the act of 1928 being presumptively and in fact excessive is not an inspection fee proper, but an internal revenue tax and its validity as such depends upon whether it contravenes the provisions of section 3 of the Organic Act of Puerto Rico. The Organic Act of Puerto Rico (Act of March 2, 1917, 39 Stat. c. 145, p. 951 et seq., as amended by the Act of Congress approved March 4, 1927, 44 Stat. 1418), in section 3 provides:

Sec. 3. That "no export duties shall be levied or collected on exports from Porto Rico, but taxes and assessments on property, income taxes, internal revenue, and license fees, and royalties for franchises, privileges, and concessions may be imposed for the purposes of the insular and municipal governments, respectively, as may be provided and defined by the Legislature of Porto Rico."

And it is further provided, that "the internal-revenue taxes levied by the Legislature of Porto Rico in pursuance of the authority granted by this chapter on articles, goods,

wares, or merchandise may be levied and collected as such legislature may direct, on the articles subject to said tax, as soon as the same are manufactured, sold, used, or brought into the island: Provided, That no discrimination be made between the articles imported from the United States or foreign countries and similar articles produced or manufactured in Porto Rico. * * * " 48 US CA §§ 741, 741a.

It is to be noted that, in addition to the license fees required to be paid under the act of 1928 (section 2), it was also provided (section 9) that "all foreign coffee in the bean, raw or roasted, ground or pulverized, that may be sold at wholesale or retail within the limits of Porto Rico (or that may be exported from Porto Rico to any point in the United States or a foreign country), shall have fastened or fixed to the sacks or containers in which it may be put or packed for sale or export, a seal or stamp," and (section 10) that the seals or stamps attached shall be on the basis of 2 cents per pound, while under the act of 1925 "all coffee in the bean, ground or powdered, exported·from Porto Rico to any place in the United States or to any foreign country, shall be placed or packed in sacks or containers holding twenty-five pounds or more not"; that the containers are also to have straps or stamps attached to them, but "said strap [or stamp] shall be affixed or attached to said containers only when they hold coffee in the bean, ground or powdered, produced solely and entirely in Porto Rico"; that the straps or stamps are of two classes, one of the value of 3 cents and one of the value of 5 cents; those of the value of 3 cents are to be attached "to containers or sacks holding from twenty-five to one hundred pounds," and those of the value of 5 cents "to those containing from one to two hundred pounds."

It is thus seen that foreign coffee is required to pay a fee or tax of 2 cents a pound, whether sold locally for Puerto Rican consumption or sold for export, while coffee produced solely and entirely in Puerto Rico, if sold for local consumption, is free of tax, and if sold for export pays only 3 cents on packages containing twenty-five to one hundred pounds and 5 cents if containing one hundred to two hundred pounds.

It is certain that the tax imposed upon foreign coffee discriminates against it and in favor of coffee produced solely and entirely in Puerto Rico, and it being an internal revenue tax, the act imposing it contravenes the provision of section 3 of the Organic Act as amended and is invalid. Walling v. Michigan, 116 U. S. 446, 6 S. Ct. 454, 29 L. Ed. 691.

It has been intimated that the provisions of the act of 1928 requiring licenses and imposing license fees of $80 a year on wholesale dealers, $20 a year on retail dealers, and like sums on their agents, are in themselves a tax on an occupation. If these license fees are taxes on an occupation, they are, nevertheless, internal revenue taxes and, being discriminatory—for no such license fees are required of dealers in Puerto Rican coffee—their imposition as such would be invalid and in contravention of section 3 of the Organic Act as amended. Walling v. Michigan, 116 U. S. 446, 6 S. Ct. 454, 29 L. Ed. 691.

Section 18 of the act of 1928, the provisions of which Suazo is charged in the criminal action with having broken, reads as follows:

"Section 18.—Dealers in foreign coffee keeping official books shall have them at the disposal of the internal revenue agents for any inspection thereof which they may desire to make at any time."

The government contends that the breach of this provision by Suazo does not involve the validity of any monetary provisions of the act of 1928; that the monetary provisions of the act could be stricken out without affecting the provisions of section 18. We do not think this contention can be sustained. The act of 1928 requires dealers in foreign coffee to keep books. Section 18 provides that all dealers keeping "official books shall have them at the disposal of the internal revenue agents for any inspection thereof." It is difficult to see how a foreign coffee dealer under the act could keep an official book without having one with a license stamp pasted upon it, as required by section 7 of the act. Section 5 of the act also provides that entries shall be made in these books of "the amount and denomination of the stamps obtained and used, with their respective dates." It is evident that "official books" could not be kept as required by the act should the monetary provisions be stricken out.

Then, again, the Legislature of Puerto Rico would never have enacted the act of 1928 without its monetary provisions, for they were the actuating motive for the enactment of the law.

The Supreme Court of Puerto Rico in this case held that the act of 1928 was an inspection law, but discriminated against dealers in foreign coffee in favor of those

dealing in Puerto Rican coffee and was invalid as in violation of the equal protection clause of the Organic Act (section 2, as amended [48 USCA § 737]) and the Fourteenth Amendment of the Constitution, and also as contravening the commerce clause by imposing an undue burden upon interstate and foreign commerce. It did not hold that it violated section 3 of the Organic Act as being a tax discriminating against articles imported from the United States or foreign countries and similar to articles produced or manufactured in Puerto Rico, for the reason that it regarded the charge imposed as an inspection fee and not a tax. The commerce clause does not extend to Puerto Rico; and in view of the conclusion here reached it is unnecessary to consider whether it violated section 2 of the Organic Act and the Fourteenth Amendment.

While in the case of Gallardo v. Questell, 29 F.(2d) 897, this court held that Act No. 22 of 1919, the predecessor of the act of 1928, did not contravene section 2 of the Organic Act or the Fourteenth Amendment, it did not consider whether Act No. 22 contravened section 3 of the Organic Act and the pertinency of section 3 was not called to its attention, as no brief was filed or argument made in this court by the appellee in whose favor the United States District Court of Puerto Rico had held the act invalid.

For the reasons we have given the order is:

The judgment of the Supreme Court of Puerto Rico is affirmed, with costs to the appellee.

MORTON, J., concurs in the result, but is of opinion that the act in question is not an "inspection law" in the constitutional meaning of those words (article 1, § 10, cl. 2). The act is in his opinion invalid as imposing a substantial tax on imported merchandise in violation of section 3 of the Organic Act.