R.C.A. COMMUNICATIONS, INC., y CABLE WIRELESS (W.I.) LTD., demandantes y recurridas, *v.* GOBIERNO DE LA CAPITAL, demandado y recurrente.

*Número:* CE-63-4 *Resuelto:* 17 de noviembre de 1964

---

[2] Véase, sin embargo, *Central Roig Refining Co.* v. *Secretario de Hacienda,* (Per Curiam) resuelto en 14 de abril de 1961.

418

*Adelaida Vicente de Souffront, Gerardo Muñoz Dones, Alberto Picó,* y *Francisco A. Rosa Silva,* abogados del recurrente; *Fiddler, González & Rodríguez, María Luisa Fuster,* y *Manuel Hernández Penzol,* abogados de las recurridas; *J. B. Fernández Badillo, Procurador General,* e *Irene Curbelo, Procurador General Auxiliar,* abogados del Estado Libre Asociado de Puerto Rico.

EL JUEZ ASOCIADO SEÑOR SANTANA BECERRA emitió la opinión del Tribunal.

En demandas interpuestas en la Sala de San Juan del Tribunal de Distrito contra el Municipio de San Juan, las corporaciones R.C.A. Communications, Inc. y Cable & Wireless (West Indies) Limited, solicitaron la devolución de cantidades pagadas por concepto de patentes durante los años 1960 y 1961. Alegaron que el cobro de las patentes fue ilegal por cuanto las demandantes hacían negocio en el comercio interestatal y sus actividades estaban reglamentadas por legislación del Congreso. Que la contribución que se les impuso por concepto de patentes era una intervención indebida por parte del Municipio de San Juan en el comercio interestatal de Estados Unidos y constituía un obstáculo a dicho comercio.

La Sala de San Juan del Tribunal de Distrito rechazó la contención de las demandantes, sostuvo la validez de la contribución y desestimó las demandas. Otro ataque hecho a la facultad del Municipio de San Juan para imponer las patentes en litigio basado en la aplicación del propio estatuto de patentes, fue igualmente desestimado por el Tribunal de Distrito, y realmente no está ahora ante nuestra consideración. Si lo estuviera, como problema de ley interno sostendríamos que el Municipio de San Juan estaba debidamente autorizado por la Asamblea Legislativa del Estado Libre Asociado de Puerto Rico para imponer y cobrar dichas patentes.

En apelación, la Sala de San Juan del Tribunal Superior revocó las sentencias del Tribunal de Distrito. Basó su fallo revocatorio en las siguientes consideraciones que copiamos:

"No hay controversia sobre los hechos. Las demandantes pagaron bajo protesta el importe de la Patente que ahora reclaman. Se dedican exclusivamente a comunicaciones entre Estados Unidos y Países extranjeros.

"La facultad para imponer Patentes Municipales surge de las Secciones 621–640, 1173 y 1479 Título 21 L.P.R.A. Dicho estatuto no es contrario al Artículo 1ro. Sección 8, Cláusula 3 de la Constitución de Estados Unidos, 27 D.P.R. 616. La Ley de Relaciones Federales autoriza la imposición de impuestos sobre la

propiedad, ingresos, rentas internas, y por licencias, franquicias, privilegios y concesiones cuando dichas contribuciones sean para fines de los gobiernos insular y municipal respectivamente y se impongan según las disposiciones y prescripciones de la Asamblea Legislativa de Puerto Rico, Sec. 3 página 165 L.P.R.A. Tomo I.

"Para resolver si les es aplicable a las demandantes la imposición del pago de patente hay que determinar la naturaleza esencial del comercio que ha de ser protegido tomando en consideración la índole del negocio. 22 D.P.R. 116; 19 D.P.R. 716; 27 D.P.R. 619 y 28 D.P.R. 910.

"El Negocio de Comunicaciones inalámbricas y por radio de las demandantes es esencialmente entre Estados y países extranjeros y una contribución de patente como requisito previo para llevar a cabo estos negocios se ha interpretado que interviene en el comercio entre Estados.

"Se revocan las sentencias del Tribunal de Distrito y en su lugar se declara con lugar las demandas y se ordena al Gobierno de la Capital a devolver y pagar a las demandantes las siguientes cantidades de dinero:—. . . [se fijan las cantidales].

El Municipio impuso y cobró las patentes en litigio haciendo uso de una facultad concedida por ley de la Asamblea Legislativa. En esas circunstancias, y las partes así lo reconocen, la impugnación de las demandantes constituye un ataque de frente al poder contributivo del propio Estado Libre Asociado de Puerto Rico en términos de sus planteamientos. Han discutido, pues, en sus alegatos, el poder público y gubernamental del Estado Libre Asociado de Puerto Rico para imponer contribución ante la naturaleza del ataque que aquí se le hace.

Por la Ley 600 de 3 de julio de 1950, Ley proveyendo para la organización de un gobierno constitucional por el pueblo de Puerto Rico, 64 Stat. 319, el Congreso de los Estados Unidos manifestó que([1]) reconociendo ampliamente el principio del gobierno por consentimiento de los gobernados aprobaba esa Ley con el carácter de un convenio, de

---

[1] Seguimos la traducción de la Asamblea Legislativa.

manera que el pueblo de Puerto Rico pudiera organizar un gobierno basado en una constitución adoptada por él mismo. Se dispuso que la Ley 600 se sometería a un referéndum para su aceptación o rechazo por los puertorriqueños y de ser aprobada por una mayoría de los electores capacitados que participaran, la Asamblea Legislativa de Puerto Rico quedaba autorizada para convocar una convención constitucional que redactara una constitución para la Isla de Puerto Rico. Se impuso como requisitos que la Constitución debería crear un gobierno republicano en forma e incluir una carta de derechos. Adoptada la constitución por el pueblo de Puerto Rico, se autorizaba al Presidente de los Estados Unidos a enviarla al Congreso si llegaba a la conclusión que la misma estaba de acuerdo con las disposiciones aplicables de dicha Ley 600 y de la Constitución de los Estados Unidos. Al ser aprobada por el Congreso la constitución entraría en vigor según sus propios términos. En ese momento, sólo algunas disposiciones de la anterior Carta Orgánica territorial de 1917 que quedaban identificadas en la propia Ley 600 seguirían en vigor, subsistiendo como un estatuto de Relaciones Federales con Puerto Rico.

Todo lo expuesto ocurrió. Los electores capacitados de Puerto Rico en referéndum celebrado aceptaron la Ley 600 el 4 de junio de 1951. La constitución aprobada por una convención constitucional se adoptó también por el pueblo mismo en votación efectuada el 3 de marzo de 1952.

Hay dos resoluciones de la propia Convención Constituyente, la Resolución Núm. 22 y la 23, aprobadas ambas en la sesión plenaria del 4 de febrero de 1952, que merecen ser mencionadas. La Núm. 22 expresó que de acuerdo con el mandato recibido del pueblo, se habría de adoptar la Constitución a cuya virtud quedaría organizada políticamente la comunidad puertorriqueña; que era necesario designar adecuadamente en los idiomas inglés y español, el cuerpo político así creado; que la palabra *"Commonwealth"* en el idioma

inglés y en su uso contemporáneo, significaba una comunidad políticamente organizada, en sentido genérico, un estado, en el cual el poder público residía inapelablemente en el pueblo, y así era un estado libre, pero vinculado a un sistema político más amplio, en asociación federativa o en otra forma que la federal, y por lo tanto no vivía independiente y separadamente; que dicha palabra *"Commonwealth"* definía claramente el *"status"* del cuerpo político que se creaba a virtud del convenio concertado entre el pueblo de Puerto Rico y los Estados Unidos, o sea el de un estado libre de autoridad superior en el ejercicio de la que le era privativa, pero que estando vinculado a los Estados Unidos de América, era parte de su sistema político en forma armónica con la estructura federal del sistema; que la traducción al español del vocablo inglés *"Commonwealth"* requería una expresión compuesta suficiente para expresar el concepto estado y el de libertad y de asociación del estado; que esa expresión era estado libre asociado; que en el caso de Puerto Rico la más adecuada traducción de *"Commonwealth"* era "estado libre asociado" pero la traducción del español como *"associated free state"* no era propia por cuanto *"state"* significaba en Estados Unidos uno de los que integran la Unión; que el cuerpo político creado por la Constitución se denominaría en inglés *"The Commonwealth of Puerto Rico"* y en español "El Estado Libre Asociado de Puerto Rico," y se dispuso que el texto de esa resolución fuera ampliamente distribuido conjuntamente con la Constitución para conocimiento del pueblo de Puerto Rico y del Congreso de los Estados Unidos.

La Resolución Núm. 23 hizo constar que la Convención Constituyente por la encomienda recibida del pueblo había aprobado una Constitución para el Estado Libre Asociado de Puerto Rico, dentro de los términos del convenio acordado con los Estados Unidos de América; que de acuerdo con los términos del convenio, dicha Constitución habría de ser sometida a la aprobación del pueblo de Puerto Rico y se dis-

puso que se hicieran constar en acta y se publicaran como *declaraciones finales* de la Convención, entre otras: (b) que con la vigencia de la Constitución el pueblo de Puerto Rico quedaba organizado en un estado libre asociado, constituido dentro de los términos de convenio establecidos por mutuo consentimiento, que era la base de nuestra unión con los Estados Unidos de América; (c) que la autoridad política del Estado Libre Asociado de Puerto Rico se ejercería de acuerdo con su Constitución y dentro de dichos términos de convenio; (d) que así se llegaba a la meta del pleno gobierno propio, desapareciendo en el principio de Convenio todo vestigio colonial. Nada podría sobrepasar en dignidad política los principios de mutuo consentimiento y de convenio libremente acordados. Sobre su plena dignidad política podrían desarrollarse otras modalidades del Estado Puertorriqueño al variarse el Convenio, por mutuo acuerdo; (e) que el pueblo de Puerto Rico retenía el derecho de proponer y aceptar modificaciones en los términos de sus relaciones con los Estados Unidos de América, de modo que éstas en todo tiempo fueran la expresión de acuerdo libremente concertado entre el pueblo de Puerto Rico y los Estados Unidos de América. Se dispuso expresamente que copia de esta Resolución Núm. 23 se enviara al Presidente de los Estados Unidos, al Presidente del Senado y al Presidente de la Cámara de Representantes de los Estados Unidos.

En el Preámbulo de la Constitución que adoptara, el pueblo de Puerto Rico expresó que a fin de organizarse políticamente sobre una base plenamente democrática, establecía esa Constitución para el estado libre asociado que en ejercicio de su derecho natural ahora creaba dentro de su unión con los Estados Unidos de América, y *declaró* el pueblo de Puerto Rico entre otros pronunciamientos:—que entendía por sistema democrático aquél donde la voluntad del pueblo es la fuente del poder público, que consideraba factores determinantes en su vida la ciudadanía de los Estados Unidos de

América y la aspiración a enriquecer su acervo democrático en el disfrute individual y colectivo de sus derechos y prerrogativas; también, la lealtad a los postulados de la Constitución Federal.

■ Ya adoptada por el pueblo de Puerto Rico su Constitución, en Resolución Conjunta de 3 de julio de 1952—Ley 447—66 Stat. 327, un subsiguiente Congreso reafirmó que la Ley 600, "Ley proveyendo para la organización de un gobierno constitucional por el pueblo de Puerto Rico" había sido adoptada por el Congreso como un convenio con el pueblo de Puerto Rico a ser efectiva después de aprobada por el Pueblo de Puerto Rico.([2]) Manifestando que el pueblo de Puerto Rico había aceptado abrumadoramente dicha Ley 600 y que también había adoptado una Constitución enteramente conforme a las disposiciones aplicables de esa Ley y de la Constitución de los Estados Unidos, que contenía una carta de derechos, y que era de forma republicana de gobierno, el Congreso dio su aprobación a la Constitución del Estado Libre Asociado.([3])

Cuando, en descargo de responsabilidades bajo el Art. IX del Tratado de París:—"Los derechos civiles y la condición

---

([2]) La Ley 600, 64 Stat. 319, dispuso según su texto original: ". . . this Act is now adopted *in the nature of a compact so that* the people of Puerto Rico may organize a government pursuant to a constitution of their own adoption." La Ley 447—posterior a la Ley 600—66 Stat. 327—expresó que la Ley 600 se había adoptado por el Congreso *as a compact with* the people of Puerto Rico," a ser efectiva a su aprobación por el Pueblo de Puerto Rico. Al final de este estatuto hay otra referencia a la Ley 600, *"in the nature of a compact."*

([3]) Excepto a la Sec. 20 del Art. II, y sujeto a la enmienda de las Secs. 5 del Art. II y 3 del Art. VII. Las enmiendas rigieron el 29 de enero de 1953. La enmienda a la Sec. 3 del Art. VII según fue textualmente requerida por el Congreso y aceptada por el Pueblo de Puerto Rico, dispone: "Cualquier enmienda o revisión de esta Constitución deberá ser compatible con la resolución decretada por el Congreso de los Estados Unidos aprobando esta Constitución, con las disposiciones aplicables de la Constitución de los Estados Unidos, con la Ley de Relaciones Federales con Puerto Rico y con la Ley Pública 600 del Congreso Octogésimo-primero, adoptada con el carácter de un convenio."

política de los habitantes naturales de los territorios aquí cedidos a los Estados Unidos se determinarán por el Congreso"—y en descargo de responsabilidades bajo la Constitución de los Estados Unidos, Art. IV, Sec. 3: "El Congreso podrá disponer de, o promulgar todas las reglas y reglamentos necesarios en relación con, el territorio o cualquier propiedad perteneciente a los Estados Unidos" (*) —*De Lima* v. *Bidwell*, 182 U.S. 1; *Downes* v. *Bidwell*, 182 U.S. 244—el Congreso aprobó la Ley 600 en los términos en que lo hiciera, los puertorriqueños tuvieron la prerrogativa de aceptar o no aceptar la acción del Congreso. De no haber sido aceptada, los acontecimientos posteriores que culminaron en la organización de la comunidad puertorriqueña en la forma de estado político en que a sí misma quiso organizarse bajo los términos de su propia Constitución, no habrían tenido lugar.

Cuando, en descargo de esas responsabilidades el Congreso aprobó la constitución adoptada por los puertorriqueños al organizarse como un estado político, varios hechos fueron evidentes:

(1) El Congreso no tuvo ante su consideración escuetamente los nueve artículos y sus respectivas subdivisiones de que se compone la Constitución misma. Tenía ante sí también y conocía las expresiones políticas del propio pueblo de Puerto Rico definidoras del estado político creado, contenidas en las Resoluciones 22 y 23 de la Convención Constituyente, y en el Preámbulo de la propia Constitución.

(2) Con pleno conocimiento de esos hechos y del pensamiento político del pueblo de Puerto Rico según fue expresado a lo largo de esos acontecimientos, el Congreso de los Estados Unidos determinó que esa Constitución no era contraria a las disposiciones aplicables de la Ley 600 y de la Constitución de

---

(*) "The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States;".

los Estados Unidos, y que tenía una forma republicana de gobierno.

(3) En el descargo de la responsabilidad hacia los puertorriqueños bajo la Sec. 3 del Art. IV de la Constitución y el Tratado de París, más particularmente en cuanto a la protección de aquellas libertades básicas y derechos personales garantizados por la Constitución de los Estados Unidos que, aun cuando Puerto Rico no era un Estado ni tampoco un territorio incorporado el Congreso debía resguardar, ya actuara directamente o a través de delegación en un gobierno local territorial—*De Lima* v. *Bidwell; Downes* v. *Bidwell,* ante; *Balzac* v. *Porto Rico,* 258 U.S. 298, págs. 312–313—el Congreso determinó también que la Constitución del Estado Libre Asociado contenía una Carta de Derechos en protección de los habitantes de Puerto Rico contra lo que pudiera ser acción del gobierno atentatoria de esas libertades básicas y garantías personales, que al Congreso le fue satisfactoria. En efecto, mirada en el espejo de la propia Constitución de los Estados Unidos y ante otros documentos universales que garantizan los derechos del ser humano, la Carta de Derechos de la Constitución del Estado Libre Asociado, en la primera ocasión que en su historia los puertorriqueños se organizaron como un Estado político con su propio gobierno, debe ser objeto de legítimo orgullo para nuestro pueblo.

(4) Al aceptar y serle satisfactoria la Carta de Derechos de la Constitución, el Congreso habría de presumir—y en efecto así es y deberá ser—que poderes públicos y los tribunales del Estado Libre Asociado harán efectivas, e interpretarán las disposiciones de esa Carta de Derechos de manera compatible con la protección que ofrecen a esas libertades básicas y garantías personales iguales o similares disposiciones de la Constitución de los Estados Unidos, y no en menor grado de protección, según éstas son o sean interpretadas y aplicadas por el Tribunal Supremo de los Estados

428

Unidos, tanto por el hecho de que somos una comunidad que ostenta la ciudadanía de los Estados Unidos, como también porque el propio pueblo puertorriqueño hizo expresión de lealtad a los postulados de la Constitución de los Estados Unidos en el Preámbulo de la Constitución que adoptara, como uno de los factores determinantes de su vida de pueblo. (⁴)

De esos hechos evidentes de que fueron protagonistas el pueblo de los Estados Unidos por su Congreso y exponente máximo y la comunidad puertorriqueña directamente por sus habitantes capacitados, y a virtud de las expresiones claras y sencillas de esos pueblos contenidas en los varios documentos que perpetuaron los acontecimentos políticos que tuvieron lugar, en derecho es claro que, contrario a los regímenes territoriales de la Ley Foraker y de la Carta Orgánica de 1917 de autoridad y poderes meramente delegados por el Congreso y sujetos a su supervisión, los poderes públicos y gubernamentales del Estado Libre Asociado de Puerto Rico en la autoridad que le es privativa, y el más fundamental entre ellos de imponer tributo consustancial con su creación misma como un Estado político y esencial a su subsistencia y para su supervivencia de Estado, emanan de sí mismo y de su propia autoridad, y siéndole ésta privativa en lo que concierne al poder de tributación, ejerce este poder libre de autoridad superior, sujeto sólo a las limitaciones de su propia Constitución y su Carta de Derechos, que ya el Congreso determinó que no era contraria a las disposiciones aplicables de la Constitución de los Estados Unidos, y a aquellas obligaciones que el pueblo se impuso al aceptar las relaciones federales que habrían de

---

(⁴) Las decisiones finales del Tribunal Supremo del Estado Libre Asociado de Puerto Rico son revisadas por el Tribunal Supremo de los Estados Unidos en igual extensión en que le es permisible revisar las decisiones en última instancia de los Estados de la Unión. Ley 87–189 de 30 de agosto de 1961, 75 Stat. 417; y véase: 28 U.S.C.A. sec. 1257. Véase Regla 62 del Tribunal Supremo de Estados Uuidos adicionada en 30 de mayo de 1963.

existir y existen con los Estados Unidos a tenor de la Ley 600. Es cierto que en el Art. 3 de la Ley de Relaciones Federales aún se encuentra la expresión residual de que se podrán imponer contribuciones e impuestos sobre la propiedad, etc. . . . cuando sean para los fines de los gobiernos insular y municipal. (5) Pero el poder básico de tributación del Estado Libre Asociado no descansa ni depende ya de esa expresión, característica de la época anterior de autoridad delegada. (6) Está ahí porque en su origen formó parte del Art. 3 de la Carta Orgánica de 1917, artículo éste que desde un principio fue esencialmente una reglamentación de relaciones con los Estados Unidos respecto a la imposición de contribuciones, y aún lo es esencialmente bajo la Ley de Relaciones Federales razón por la cual quedó en pie, particularmente después que se eliminó de dicho Art. 3, por la Ley 87–121 de 3 de agosto de 1961, 75 Stat. 245, la materia relativa al margen prestatario. (7)

La contribución aquí en litigio, impuesta en virtud de ley de la Asamblea Legislativa de Puerto Rico, no es contraria a disposición alguna de la Constitución del Estado Libre Asociado. Si hubiera algún obstáculo legal para sos-

---

(5) En *P.R. Telephone Co.* v. *Tribl. Contribuciones*, 81 D.P.R. 982 (1960), dijimos que esto era equivalente a la frasè "para un fin público."

(6) Consúltese *Rivera* v. *Corte*, 62 D.P.R. 513 (1943).

(7) Evitando una enumeración detallada de disposiciones, basta señalar aquella disposición de la Ley Foraker, Sec. 31, 31 Stat. 83: "Que toda ley decretada por la Asamblea Legislativa será comunicada al Congreso de los Estados Unidos, el que por la presente se reserva la facultad de anularla si lo tuviera por conveniente," y aquella otra similar de la Carta Orgánica de 1917, Art. 34, 39 Stat. 960: "Todas las leyes decretadas por la Asamblea Legislativa de Puerto Rico serán comunicadas al Congreso de los Estados Unidos, . . . el cual se reserva por la presente la facultad y autoridad de anularlas," para dramatizar la naturaleza esencialmente de poderes delegados de esos regímenes, y la inmediata supervisión del Congreso del ejercicio de la delegación de autoridad, disposiciones que se mantuvieron vigentes, excepto por un breve lapso en que desaparecieron en el año 1928, y fueron prontamente restituidas, hasta que surgió el Estado Libre Asociado, a pesar del liberal pensamiento de *Puerto Rico* v. *Shell*, 302 U.S. 253 (1937) y otras decisiones del Tribunal Supremo de Estados Unidos.

tenerla habría que buscarlo en alguna disposición, o como consecuencia de alguna disposición, de la Ley de Relaciones Federales. Las limitaciones de esta Ley que aceptó el pueblo de Puerto Rico a su poder de tributación no están envueltas en este litigio. Esas limitaciones expresas son que no se impondrá ni cobrará derecho alguno sobre las exportaciones procedentes de Puerto Rico, y que al imponer contribuciones de rentas internas sobre cualesquiera artículos, efectos, mercaderías o mercancías, el Estado Libre Asociado no hará distinción alguna entre los artículos importados de los Estados Unidos o de países extranjeros y los artículos similares producidos o manufacturados en Puerto Rico. También, la obligación de Puerto Rico de respetar los derechos, privilegios e inmunidades de los ciudadanos de los Estados Unidos hasta el mismo grado en que bajo el inciso 1 de la Sec. 2 del Art. IV de la Constitución Federal los ciudadanos de cada Estado disfrutan de todos los privilegios e inmunidades de los ciudadanos en los distintos Estados. Ley de Relaciones Federales, Arts. 2 y 3. Y véase: *Postley* v. *Secretario de Hacienda*, 75 D.P.R. 874 (1954).

Resta considerar entonces si la contribución impugnada está en conflicto con o debe ceder ante alguna ley estatutaria de los Estados Unidos que no sea localmente inaplicable, que tuviere el mismo efecto y validez en Puerto Rico que en los Estados Unidos—Ley de Relaciones Federales, Art. 9—o está en conflicto con y deba ceder ante leyes o parte de leyes aplicables a Puerto Rico al crearse el Estado Libre Asociado, que el pueblo de Puerto Rico aceptó que quedaran en vigor a tenor del Art. 58 de dicha Ley de Relaciones Federales. Se ataca la contribución en litigio porque según las demandantes se interfiere con la reglamentación del comercio interestatal reservada al Congreso y porque la contribución constituye un obstáculo a dicho comercio. Veamos:

■■■■■ Es un hecho histórico que la Constitución de los Estados Unidos de su faz y por su propia fuerza no se ex-

tendió a los habitantes de Puerto Rico por el hecho mismo de la cesión en el Tratado de París. Es un hecho histórico que el Congreso de los Estados Unidos, en el ejercicio de su autoridad bajo el inciso 2 de la Sec. 3 del Art. IV de la Constitución, desde un principio no extendió ni ha extendido directamente a Puerto Rico las disposiciones mismas de la Constitución, como hizo en relación con otras comunidades, excepto la acción tomada en el año 1947 por la Ley 362, 61 Stat. 770, en que equiparó a Puerto Rico a un Estado de la Unión a los efectos de hacer aquí efectivo el inciso 1 de la Sec. 2 del Art. IV, sobre los privilegios e inmunidades de los ciudadanos de los Estados en los distintos Estados. Es otro hecho histórico que la disposición constitucional que reserva al Congreso el poder de reglamentar el comercio con naciones extranjeras, entre los Estados y con las tribus indias, no sólo no ha regido ni rige por su propia fuerza en Puerto Rico sino que por el contrario, el Congreso dispuso de manera expresa que no serían aplicables a Puerto Rico la Ley sobre Comercio Interestatal y las varias enmiendas hechas o que se hicieran a ella . . . ni tampoco una Ley para regular el comercio, de 4 de febrero de 1887 y las leyes enmendatorias de la misma, según el Art. 38 de la Carta Orgánica de 1917—39 Stat. 964—y que aún prevalece formando parte de la Ley de Relaciones Federales. Finalmente, es un hecho histórico que por disposición expresa del Congreso desde un principio las leyes de rentas internas de los Estados Unidos no tuvieron ni tienen fuerza o validez en Puerto Rico. Sec. 14 Ley Foraker, 31 Stat. 80; Art; 9, Ley de Relaciones Federales—39 Stat. 954. ([8])

---

([8]) A este respecto, véanse: La Ley Núm. 3 de mayo 6 de 1959 y la Resolución Conjunta Núm. 97 de 22 de junio de 1956, concediéndose por el Estado Libre Asociado de Puerto Rico el consentimiento para que tengan efectividad en Puerto Rico ciertas disposiciones del Código Federal de Rentas Internas, y dando su consentimiento para que se cobre en Puerto Rico un tributo federal sobre elaboración de azúcar refinado. También la Resolución Conjunta Núm. 1 de 25 de julio de 1956.

432

■■■■ Por supuesto, en el pasado ha habido, como la hay en el presente, relación de comercio interestatal entre Puerto Rico y los Estados Unidos, pero esa relación rigió por disposiciones expresas del Congreso en uso de su autoridad bajo el inciso 2 de la Sec. 3 del Art. IV de la Constitución Federal, y al presente a tenor de la Ley 600. Esta relación de comercio interestatal constitucionalmente ha tenido y aún tiene perfiles distintos de la que por virtud de la Constitución rige entre los Estados de la Unión. De ahí que aun bajo los regímenes anteriores, Puerto Rico, pudo ejercer la facultad de tributación y el Estado Libre Asociado pueda ejercer hoy ese poder en cuanto al comercio interestatal se refiere, en forma que tal vez a un Estado cubierto por las disposiciones de la Constitución Federal, no le sería permisible. [9]

Las patentes en litigio se impusieron en virtud de la Ley Núm. 26 de 28 de marzo de 1914 según ha sido enmendada, 21 L.P.R.A. secs. 621–640, y de la Ordenanza Núm. 46—Serie 1959–60—del Municipio de San Juan. Esta ordenanza sujeta al pago de patentes un negocio o empresa dedicado a (11) "Comunicaciones por cable o teletipo o radio telefonía o radio telegrafía o teletipo o similares." Las patentes se cobraron de acuerdo con la Sec. 3 de la Ley de Patentes, sobre la base del volumen de negocios efectuados durante el año natural inmediatamente anterior. La Ley define volumen de negocios en su Sec. 4 como los *ingresos brutos* que tenga en cualquier municipio el negocio o industria procedentes de

---

[9] *De Lima* v. *Bidwell; Downes* v. *Bidwell,* antes citados; *Dooley* v. *United States,* 182 U.S. 222, 183 U.S. 151; *West India Oil Co.* v. *Domenech,* 311. U.S. 20; *Lugo* v. *Suazo,* 59 F.2d 386 (1st Cir. 1932), *Sancho* v. *Bacardí Corporation of America,* 109 F.2d 57 (1st Cir. 1940); *Buscaglia* v. *Ballester,* 162 F.2d 805 (1st Cir. 1947), *cert.* denegado 332 U.S. 816; *Texas Co. (P.R.) Inc.* v. *Tribunal de Contribuciones,* (Hernández Matos), 82 D.P.R. 134 (1961), confirmado bajo el nombre *Texaco Puerto Rico, Inc.* v. *Descartes,* 304 F.2d 184 (1st Cir. 1962); *cert.* denegado, 372 U.S. 907. Y véanse: *Inter Island Shipping Corporation* v. *Comisión Industrial,* (Belaval) 89 D.P.R. 648 (1963); *Fonseca* v. *Prann,* 282 F.2d 153 (1st Cir. 1960), *cert.* denegado, 365 U.S. 860. *Miranda* v. *People of P.R.,* 101 F.2d 26 (1st Cir. 1938), sobre derechos de aduana.

las operaciones que realiza en Puerto Rico, sin tener en cuenta sus ganancias o beneficios; . . . el importe de las ventas tratándose de tiendas, comercio o industrias, . . . el importe de lo recaudado por servicios telefónicos o eléctricos, cuando se trata de empresas de esta índole, y en general el monto de los ingresos habidos por cualquier negocio hecho o servicio prestado, de acuerdo con la naturaleza del negocio o industria establecido.

■ Conocida la naturaleza de la contribución que se litiga habremos de decir que aun cuando el poder contributivo del Estado Libre Asociado y las contribuciones en litigio estuvieran situados en la órbita constitucional de los Estados mismos en cuanto al comercio interestatal se refiere —y vemos que tal poder contributivo no está así limitado— todavía la validez de la contención de las demandantes al efecto de que la imposición y cobro de estas patentes interfiere con la reglamentación del comercio interestatal y son un obstáculo al mismo quedaría bastante en precario de acuerdo con conocidos casos del Tribunal Supremo de los Estados Unidos, que no requieren ahora discusión detallada por la reafirmación hecha en *General Motors Corp.* contra *el Estado de Washington*, 377 U.S. 436, resuelto en 8 de junio de 1964, al que nos referimos por vía de ilustración.

Parecido a la situación ante nos, la contribución en el caso de *Washington* se impuso medida por las *ventas brutas* al por mayor de la General Motors de motores de vehículos, partes y accesorios entregados en el Estado de Washington. Se alegó que esa contribución sobre ingreso bruto no prorrateada era una contribución por el privilegio de dedicarse al comercio interestatal, inherentemente discriminatoria y que resultaba en la imposición de una carga contributiva múltiple, y una privación de la propiedad sin debido procedimiento de ley. La Corte Suprema de Washington sostuvo la contribución y el Tribunal Supremo de los Estados Unidos

434

confirmó. Manifestó el Tribunal por voz de su Juez Asociado, Sr. Clark:

"Comenzamos expresando que no fue intención de la cláusula de comercio eximir a aquellos dedicados al comercio interestatal de su justa aportación a la carga contributiva del estado aun cuando ello aumentare el costo de llevar a cabo el negocio." *Western Live Stock* v. *Bureau of Revenue*, 303 U.S. 250, 254 (1938). 'Aun el comercio interestatal debe pagar su curso,' *Postal Telegraph-Cable Co.* v. *Richmond*, 249 U.S. 252, 259 (1919), según lo evidencian numerosas opiniones de este Tribunal. Por ejemplo, la Corte ha sostenido contribuciones sobre la propiedad a los medios utilizados en el comercio, *Western Union Telegraph Co.* v. *Attorney General*, 125 U.S. 530 (1888) ; sobre propiedad dedicada a la transportación interestatal prorrateada equitativamente según su uso dentro del Estado, *Pullman's Palace Car Co.* v. *Pennsylvania*, 141 U.S. 18 (1891) ; sobre ganancias derivadas del comercio interestatal con una contribución sobre ingreso neto, *William E. Peck and Co.* v. *Lowe*, 247 U.S. 165 (1918) y *United States Glue Co.* v. *Oak Creek*, 247 U.S. 321 (1918) ; por medio de impuestos de privilegio, (*franchise taxes*) medidos por el ingreso neto de una corporación comercialmente domiciliada derivado de comercio interestatal, atribuible a negocios realizados en el Estado y equitativamente prorrateados, *Underwood Typewriter Co.* v. *Chamberlain*, 254 U.S. 113 (1920) ; por un impuesto (*Franchise tax*) medido a base de una fórmula proporcional sobre ganancias de un negocio unitario manufacturero de cerveza, 'sin resultar el proceso de manufactura en ganancias hasta que desemboca en las ventas,' *Bass, Ratcliff and Gretton, Ltd.* v. *State Tax Comm'n*, 266 U.S. 271, 282 (1924) ; por una contribución personal sobre la propiedad impuesta por un Estado domiciliario a una flota de aviones cuyo puerto de matrícula ubicaba en el Estado tributante, a pesar del hecho de que se pagaron contribuciones personales de propiedad sobre parte de la flota en otros Estados, *Northwest Airlines, Inc.* v. *Minnesota*, 322 U.S. 292 (1944) ; por una contribución sobre ingreso neto de beneficios obtenidos del comercio interestatal equitativamente asignados a las actividades comerciales dentro del Estado, *Northwest States Portland Cement Co.* v. *Minnesota* 358 U.S. 450 (1959) ; y por una contribución de privilegio (*franchise tax*) impuesta a una compañía de porteo, en sus-

titución de contribuciones sobre intangibles y bienes rodantes, medida por ingresos brutos, equitativamente distribuidos, y provenientes de la transportación dentro del Estado, *Railway Express Agency, Inc.* v. *Virginia*, 358 U.S. 434 (1959).

"Sin embargo, las contribuciones locales a base de ingresos brutos derivados del comercio interestatal no siempre han marchado tan bien. Debido a que cada Estado tiene iguales derechos cuando tributa el comercio que alcanza, existe el peligro que tales contribuciones pueden imponer cargas acumulativas sobre transacciones interestatales que no se le presentan al comercio local. Cf. *Michigan-Wisconsin Pipe Line Co.* v. *Calvert*, 347 U.S. 157, 170 (1954); *Philadelphia and Southern S.S. Co.* v. *Pennsylvania*, 122 U.S. 326, 346 (1887). Tales cargas destruirían el comercio interestatal y alentarían de nuevo la erección de aquellas barreras comerciales que hicieron necesaria la Cláusula de Comercio. Cf. *Baldwin* v. *G.A.F. Seeling, Inc.*, 294 U.S. 511, 521–522 (1935). Y en este sentido hemos sostenido expresamente que el comercio interestatal no puede ser sometido a la carga de una 'tributación múltiple.' *Michigan-Wisconsin Pipe Line Co.* v. *Calvert*, supra, pág. 170. No obstante, según hemos visto, está bien establecido que una tributación medida por ingresos brutos es constitucionalmente válida si está equitativamente repartida.

"Un cuidadoso análisis de los casos en esta área nos enseña que la legalidad de la contribución descansa en el hecho de si el Estado hace una demanda constitucionalmente razonable sobre aquel aspecto del comercio interestatal con el que guarda especial relación. Para nuestros propósitos, la cuestión decisiva gira alrededor de la incidencia en la operación de la contribución. En otras palabras, la cuestión es si el Estado ha ejercido su facultad en proporción adecuada a las actividades de la apelante dentro del Estado y al consiguiente disfrute por la apelante dentro de las oportunidades y protecciones que el Estado ha brindado. Cuando, como en el caso de autos, el Estado tributante no es el Estado domiciliario, miramos hacia las actividades comerciales del contribuyente dentro del Estado, i.e., los incidentes locales, para determinar si las entradas brutas de las ventas dentro del Estado, pueden estar razonablemente relacionadas con esas actividades. Según dijimos en *Wisconsin* v. *J. C. Penney Co.*, 311 U.S. 435, 444 (1940), 'la cuestión simple pero decisiva es si el Estado ha concedido algo a cambio de lo cual puede solicitar recompensa.'

• • • • • • • •

" 'Está fuera de discusión,' dijimos en *Northwestern States Portland Cement Co.* v. *Minnesota,* supra, 458, 'que un Estado no puede imponer una contribución por el "privilegio" de dedicarse al comercio interestatal.' Pero ése no es este caso. Afirmar eso aquí sería ignorar una larga línea de casos de esta Corte que han sostenido que una actividad dentro del estado, puede ser un incidente local suficiente sobre el que puede basarse una contribución. Como se dijo en *Spector Motor Service, Inc.* v. *O'Connor,* 340 U.S. 602, 609 (1951), 'el Estado no está impedido de imponer contribuciones sobre otras actividades o aspectos de este negocio [interestatal] que, distinto al privilegio de hacer comercio interestatal, están sujetos al poder soberano del Estado.' Esto es exactamente lo que Washington trata de hacer aquí y no podemos decir que la apelante ha demostrado que sus actividades dentro del Estado no son esos incidentes que el Estado pueda alcanzar. *Norton Co.* v. *Department of Revenue,* supra, 537."

Finalmente, concluye el Tribunal:

"Una situación más difícil podría surgir de la alegación de la apelante sobre tributación múltiple. *Gwin, White & Prince, Inc.* v. *Henneford,* 305 U.S. 434, 440 (1939). General Motors sostiene que algunos de sus productos tributados por Washington se manufacturan en St. Louis donde se impone una contribución de licencia, medida por las ventas antes de embarque. Véase: *American Mfg. Co.* v. *St. Louis,* 250 U.S. 459 (1919). También se urge que la actividad de Oregon de General Motors que concierne a las ventas de Washington podrían ofrecer suficiente base para una contribución similar por Oregón. La Corte tocó el problema de tributación múltiple en *Northwest Airlines* v. *Minnesota,* supra, 295, pero lo echó a un lado como 'que no está ahora ante nosotros.' Posteriormente, en *Northwestern States Portland Cement Co.* v. *Minnesota,* supra, 463, sostuvimos que 'en este tipo de caso los contribuyentes deben demostrar que la fórmula pone una carga sobre el comercio interestatal en el sentido constitucional.' La apelante no ha hecho eso . . . En tales casos nos hemos abstenido de pasar sobre la cuestión de 'tributación múltiple,' e.g. *Northwestern States Portland Cement Co.* v. *Minnesota,* supra, y nos atenemos a esa posición."

Asumiendo, o en el supuesto, que el Estado Libre Asociado se hallara en la misma posición constitucional de los Estados de la Unión en lo que al comercio interestatal respecta, nos parece que tendríamos suficiente base a la luz del fallo anterior, y de otros fallos del Tribunal Supremo, para sostener la validez de la contribución aquí impugnada.

Pero, más que el ataque de tipo general de las demandantes de que ésta es una contribución ilegal al margen del comercio interestatal y obstructora de éste, la cuestión realmente aquí envuelta parece ser otra.

Las demandantes son empresas comerciales privadas que operan con fines de lucro. Sus actividades, sin embargo, por la naturaleza de las mismas, están sujetas a reglamentación del Gobierno de los Estados Unidos bajo la "Ley de Comunicaciones de 1934"—48 Stat. 1064, 47 U.S.C.A. secs. 151 *et seq.* La Sec. 151 de la Ley de Comunicaciones de 1934 que contiene una exposición de motivos hecha por el Congreso de dicha Ley, expresa que con el fin de reglamentar el comercio interestatal y extranjero en la comunicación por cable (*wire*) y radio de modo de proveer, hasta donde es posible, a toda la gente de los Estados Unidos un servicio rápido, eficiente, a través de toda la Nación y del mundo, de comunicación por cable y radio, con los medios adecuados bajo tarifas o cargos razonables, para fines de la defensa nacional, para el propósito de promover la seguridad de la vida y de la propiedad mediante el uso de comunicaciones por cable y radio, y con el propósito de asegurar una más efectiva ejecución de esos fines centralizando la autoridad anteriormente concedida por ley a varias agencias y concediendo autoridad adicional con respecto al comercio interestatal y con el extranjero en la comunicación por cable y radio, se crea la "Comisión Federal de Comunicaciones" para hacer efectivas las disposiciones de dicha Ley.

Esta Ley regía en Puerto Rico al momento de surgir el Estado Libre Asociado y de aceptarse la Ley 600 como esta-

tuto de relación, y sus disposiciones reglamentaban el funcionamiento de empresas situadas en Puerto Rico dedicadas a esa actividad de comunicación. De acuerdo con el Art. 9 de la Ley de Relaciones Federales en vigor el 25 de julio de 1952, 39 Stat. 954, las leyes estatutarias de los Estados Unidos que no sean *localmente inaplicables* tienen el mismo efecto y validez en Puerto Rico que en los Estados Unidos; y de acuerdo con el Art. 58 de la propia Ley de Relaciones Federales, 39 Stat. 968, las leyes ya aplicables a Puerto Rico al aceptarse dicha Ley de Relaciones que no estuvieran en contradicción con la misma, continuarán en vigor.

■ Ante los propósitos y fines de la Ley de Comunicaciones de 1934—la defensa nacional de los Estados Unidos inclusive—de interés para toda la Nación y el mundo, no es necesario argüir que dicha Ley de Comunicaciones de 1934 que regía al aceptarse la Ley 600, no es una de las leyes que serían *localmente inaplicables*, a tenor del Art. 9 antes citado de la Ley de Relaciones Federales, ni tampoco sería una contradictoria a este estatuto a tenor del Art. 58.

En la Ley de Comunicaciones de 1934 las demandantes están catalogadas como porteadores públicos (*common carriers*) bajo la Sec. 201 y siguientes de la Ley. Sus servicios, prácticas, sistemas, operaciones técnicas y comerciales y demás actividades, así como sus tarifas y cargos, están plenamente reglamentados por la Autoridad Federal. Tienen el deber de ofrecer aquellos servicios y cobrar aquellas tarifas que sean justos y razonables, y cualquier tarifa injusta o irrazonable se declara ilegal por la Ley; y vienen obligadas —Sec. 203—a someter a la Comisión Federal de Comunicaciones, y mantener para inspección pública, sus tarifas y cargos, que pueden ser investigados y anulados por la Comisión si resultan en violación de la Ley o no fueren razonables y justos. No obstante la pormenorizada reglamentación de sus actividades, servicios y negocios, las demandantes no necesitan la autorización previa de la Autoridad Federal a

través de una licencia para dedicarse a su aspecto de comercio interestatal, a distinción de las estaciones radio-emisoras que por disposición expresa de la Ley no son tratadas como porteadores públicos—Sec. 153(h)—y que necesitan de tal autorización o licencia previa para poder dedicarse a sus actividades—Sec. 301.

▬▬▬ La Ley de Comunicaciones de 1934 no impone a las demandantes y sus actividades o negocios contribución o tributo alguno, ni en particular por concepto de *licencia,* ya sea con el fin de reglamentación o ya sea para fines de allegar rentas federales. Por otra parte, la Ley de Patentes de Puerto Rico tampoco impone a las demandantes ni a ningún negocio o actividad comercial cubierto por la Ley, una contribución por concepto de licencia como requisito previo de reglamentación o como permiso o autoridad para que puedan dedicarse a sus actividades. La conclusión de la Sala sentenciadora al efecto de que la contribución de patente aquí envuelta era un requisito previo para que las demandantes pudieran dedicarse a sus actividades, dándole el efecto de ser una licencia por parte del Estado Libre Asociado para permitirles dedicarse a ese negocio interestatal, fue una errónea interpretación de nuestro estatuto de Patentes. Esta ley incuestionablemente no tiene otro propósito sino el de allegar rentas para los municipios. La contribución se fija a base de los negocios realizados en el año anterior, y si no se pagare, se cobra por los medios ordinarios, pero no impide ni hace ilegal el que la contribuyente continúe haciendo negocios.

Este caso, como se dijo en la decisión de *General Motors* antes citada refiriéndose a la acción del Estado de Washington, tampoco es el caso en que se haya impuesto una contribución por vía de otorgar una licencia que concedería o negaría a las demandantes el privilegio de dedicarse a una actividad de comercio interestatal.

▬▬▬ El hecho sólo de que la Ley de Comunicaciones de 1934 reglamente por Autoridad Federal las actividades

y servicios de las demandantes realizados en Puerto Rico, no las inmuniza de la autoridad contributiva del Estado Libre Asociado como tampoco las inmuniza de su poder de policía, si bien esto último no está ahora envuelto, ni de ningún otro poder gubernamental del Estado Libre Asociado, el ejercicio del cual no esté claramente y de manera irreconciliable en conflicto con la Autoridad Federal ejercida cuando ésta rigiere. Las controversias que atañen al poder contributivo del Estado han de ser analizadas y resueltas sobre consideraciones fundamentalmente prácticas. Es un poder muy valioso a la vida del Estado para que estas controversias se resuelvan teóricamente a base de refinamientos doctrinales. Si algo enseña la intensa discusión de los Jueces en *De Lima* v. *Bidwell* y *Downes* v. *Bidwell*, es precisamente eso. Seríamos un poco ingenuos si creyéramos que el pago de estas relativamente pequeñas cantidades de patentes por las demandantes haría rodar por el suelo los propósitos y fines de la Ley de Comunicaciones de 1934.

La Constitución dispone, Art. VI, Sec. 2, que el poder del Estado Libre Asociado de Puerto Rico para imponer y cobrar contribuciones y autorizar su imposición y cobro por los municipios se ejercerá según se disponga por la Asamblea Legislativa, y nunca será rendido o suspendido. Este Tribunal no puede estar inclinado a rendirlo fácilmente, y sólo lo anularía cuando se ejerciere en violación de las disposiciones aplicables de la Constitución del Estado Libre Asociado, o de los derechos personales garantizados por dicha Constitución—ninguna persona será privada de su libertad o propiedad sin el debido proceso de ley, ni se negará a persona alguna en Puerto Rico la igual protección de las leyes—o si se ejerciere en violación de las obligaciones legales y morales que aceptó el pueblo en sus Relaciones Federales. Nada hay en la Ley de Patentes de Puerto Rico ni en el cobro de la contribución impugnada por las demandantes que interfiera, obs-

truya o destruya la Autoridad Federal ejercitada en virtud de Ley de Comunicaciones de 1934.

 Desde el punto de vista de la protección constitucional del debido procedimiento, tampoco puede decirse que el Estado Libre Asociado de Puerto Rico no ofrece nada a las demandantes a cambio de lo que les quita. *Memphis Gas Co.* v. *Stone*, 355 U.S. 80, 96.

*Por las consideraciones anteriormente expuestas, se revocarán las sentencias recurridas y se devolverán los autos a la Sala de San Juan del Tribunal Superior para que dicte otras confirmando las de la Sala de San Juan del Tribunal de Distrito que declararon sin lugar las demandas de devolución de patentes.*

Los Jueces Asociados Señores Blanco Lugo y Ramírez Bages concurren en el resultado.