HON. ZAIDA HERNÁNDEZ TORRES, en su capacidad de REPRESENTANTE DE LA CÁMARA, apelada, *v.* HON. RAFAEL HERNÁNDEZ COLÓN, HON. MIGUEL HERNÁNDEZ AGOSTO, HON. JOSÉ R. JARABO Y HON. NYDIA I. VELÁZQUEZ, todos en su carácter oficial, apelantes.

*Número:* AC-90-707          *Resuelto:* 27 de septiembre de 1990

*Lino J. Saldaña,* de *Saldaña, Rey & Alvarado,* abogado del Hon. Rafael Hernández Colón, Gobernador de Puerto Rico, y la Hon. Nydia I. Velázquez, Directora del Departamento de Asuntos de la Comunidad Puertorriqueña en los Estados Unidos, apelantes; *Manuel D. Herrero García* y *Carlos Santiago Tavárez,* abogados de la apelada.

## RESOLUCIÓN

Vista la apelación presentada en este caso, se da curso a la misma por plantear una cuestión constitucional sustancial.

A la Moción en Auxilio de Jurisdicción, no ha lugar por académica, toda vez que se ha dado curso a la apelación; en consecuencia, la sentencia dictada en este caso por el tribunal de instancia no es firme y, por lo tanto, el *injunction* dictado en este caso no ha adquirido vigencia a la luz de lo dispuesto en el Art. 678 del Código de Enjuiciamiento Civil, según enmendado, 32 L.P.R.A. sec. 3524. En dicho artículo se dispone que "no podrá otorgarse un *injunction* . . . [p]ara impedir la aplicación . . . de cualquier ley de la Asamblea Legislativa de Puerto Rico . . . a menos que se hubiera determinado por sentencia final, *firme, inapelable* e *irrevisable* que dicha ley o actuación autorizada por ley es inconstitucional o inválida". (Énfasis suplido.) Véase, además, *Arrarás v. Tribunal Superior*, 100 D.P.R. 379 (1972). No existen en este caso las circunstancias que justifican las excepciones contenidas en dicho artículo a que alude la parte apelada en su oposición.

Lo acordó el Tribunal y certifica el señor Secretario General. El Juez Asociado Señor Negrón García emitió voto disidente. El Juez Asociado Señor Rebollo López, "no obstante ser de la opinión que el recurso de apelación radicado por la parte demandada apelante efectivamente plantea una cuestión constitucional sustancial, disiente por razón de que es del criterio que el Tribunal debió de haber realizado un esfuerzo por resolver el recurso en sus méritos dentro de un razonable y responsable período corto de tiempo en lugar de darle curso al recurso de apelación, acción mayoritaria que *posiblemente* permita una erogación, sustancial e ilegal, de fondos públicos en la eventualidad de que la Ley Núm. 58 de 16 de agosto de 1989 [3 L.P.R.A. sec. 443 *et seq.*] sea finalmente declarada parcialmente inconstitucional por este Tribunal. La controversia planteada, no obstante ser de 'primera impresión' en esta jurisdicción, es una que no es extremadamente compleja y difícil de resolver. A nuestra manera de ver las cosas,

existe una gran posibilidad de que la citada Ley 58 pueda ser constitucional de su faz e inconstitucional en su aplicación por constituir la conducta de los empleados del departamento ejecu-, tivo en controversia una indebida interferencia en el proceso eleccionario de un estado soberano; dicha determinación posible-́ mente requiera que se devuelva el caso al foro de instancia para la celebración de una vista evidenciaria". La Juez Asociada Señora Naveira de Rodón no intervino.

(*Fdo.*) Francisco R. Agrait Lladó
*Secretario General*

—O—

Voto disidente del Juez Asociado Señor Negrón García.

*IDENTIDAD CULTURAL NO ES SINÓNIMO DE JURISDICCIÓN CONSTITUCIONAL EXTRATERRITORIAL.* Esta frase sintetiza nuestra razón de decidir (*ratio decidendi*).

En virtud de la misma denegaríamos de plano la solicitud de los demandados apelantes, Hons. Rafael Hernández Colón y Nydia I. Velázquez, de que paralicemos los efectos del *injunction* emitido el 24 de septiembre de 1990 por el Tribunal Superior, Sala de San Juan (Hon. Arnaldo López Rodríguez, Juez). Éste declaró inconstitucional una parte sustancial de la Ley Núm. 58 de 16 de agosto de 1989 (3 L.P.R.A. sec. 443 *et seq.*) que creó el *Departamento de Asuntos de la Comunidad Puertorriqueña en los Estados Unidos del Gobierno del Estado Libre Asociado de Puerto Rico.* En lo *procesal,* la paralización de los procedimientos es improcedente.

El argumento de los demandados apelantes, honorables Hernández Colón y Velázquez, de que la ley anti *injunction,* Ley Núm. 1 de 25 de febrero de 1946, según enmendada, 32 L.P.R.A. sec. 3524, no permite la vigencia inmediata del presente *injunction* —hasta que recaiga por este Foro un decreto de inconstitucionalidad, final y firme— carece de mérito. "Esta legislación obedeció al propósito de impedir la paralización del gobierno *mediante alegaciones privadas* de inconstitucionalidad.

La legislación no persigue el objetivo de evitar que en pleitos revestidos de alto interés público" no se pueda impugnar efectivamente la constitucionalidad de un estatuto por parte de un funcionario público que goza de legitimación activa para ello. (Énfasis suplido.) *Hernández Agosto v. López Nieves*, 114 D.P.R. 601, 612 (1983).

Debido al alto interés público de esta apelación, al amparo de la Regla 50 de nuestro Reglamento, 4 L.P.R.A. Ap. I-A, confirmaríamos sin ulterior trámite la sentencia de *injunction*.

Distinto a lo que nos proponen los demandados apelantes, honorables Hernández Colón y Velázquez, de suspenderse el *injunction*, el Pueblo de Puerto Rico sufriría daños irreparables. Continuará en Nueva York y otros estados la campaña ilegal de inscripción y el derroche de cientos de miles de dólares de fondos públicos en contravención al Art. VI, Secs. 9 y 10 de nuestra Constitución, L.P.R.A., Tomo 1. Lo más serio de esta situación es que dicha erogación es a costa del sacrificio de otros valores humanos y necesidades comunitarias *aquí en Puerto Rico*. Ello, en momentos en que existe una grave crisis presupuestaria que ha exigido la eliminación y disminución de varios programas esenciales de servicio público (salud, policía, vivienda y educación, entre otros).

A la larga, de confirmarse el decreto de inconstitucionalidad, ¿quién responderá al Pueblo de los excesivos desembolsos? ¿Los demandados? No podemos olvidar que estos fondos públicos provienen de contribuyentes representativos de todo el *spectrum* político insular, incluso los desafiliados. ¿No nos impone esta realidad la responsabilidad de decidir *ahora* y evitar que continúe este dispendio? ¿No configura ello, de su faz, una patología gubernamental de pago ilegal que exige nuestra más pronta y decidida intervención?

En lo *sustantivo*, estamos ante una cuestión de derecho constitucional *puro* que, aunque nunca ha sido resuelta por este Foro, no es de difícil adjudicación: ¿tiene el Estado Libre Asociado poder para crear un Departamento Ejecutivo, con rango de gabinete y sede fuera de los límites territoriales de Puerto Rico,

para prestar *servicios gubernamentales,* de carácter electoral, a residentes de Estados Unidos de origen o ascendencia puertorriqueña? Expongamos los antecedentes de esta interrogante.

I

*Ámbito estatutario*

La Ley Núm. 58, *supra,* según su exposición de motivos, parte de la premisa siguiente:

[F]uera de toda duda razonable que los rasgos distintivos de la emigración puertorriqueña a los Estados Unidos *son la continuidad de la identidad cultural, la no ruptura de los entendidos sociales, y la permanencia de lazos afectivos con la tierra de origen,* los que se fortalecen con la ausencia y el transcurrir del tiempo. A[u]n los descendientes de los emigrantes, nacidos y criados en los Estados Unidos, a menudo se remiten a la sociedad de origen de sus padres para fortalecer su identidad *cultural* y para encontrar explicación a su realidad existencial. Reviste vital importancia que ganemos conciencia de las implicaciones de este hecho . . . .

*Hoy día carece de validez hablar de la comunidad puertorriqueña en los Estados Unidos como entidad separada y no incorporada a Puerto Rico. Ciertamente somos un mismo pueblo separados (sic) sólo por el mar y unidos (sic) integralmente por la cultura y por los sistemas modernos de transportación, comunicación e información.* Esta realidad es trascendental, pues nos impone el deber de reafirmar y fortalecer nuestro compromiso de ayudar a los compatriotas que viven y se desempeñan en Estados Unidos, en consonancia con las necesidades del presente y del futuro.

La creación de un departamento con *rango a nivel de gabinete* reconoce la alta prioridad que concedemos a este compromiso y acentúa *la presencia* y disponibilidad del Estado Libre Asociado de Puerto Rico como instrumento útil al servicio de esta comunidad para su progreso económico y social.

El progreso de toda comunidad está ligado al grado en que ésta logre ejercitar su poder cívico y político. Esto último se manifiesta a través de las instituciones y organizaciones de dicha comunidad. Por consiguiente, este nuevo Departamento fomentará como medida prioritaria el desarrollo y fortalecimiento de las organizaciones

de la comunidad puertorriqueña en los Estados Unidos. (Énfasis suplido.) Exposición de Motivos de la Ley Núm. 58, *supra*.

Se observa, pues, que el estatuto se apuntala en la cuestionable *visión sociológica* —de profundo contenido emocional— que le atribuye al puertorriqueño que emigra un amor desmedido y especial hacia la Isla, transmisible a sus hijos. Así se justifica "ayudar *a la comunidad puertorriqueña en los Estados Unidos en sus esfuerzos por promover su progreso social y económico*". (Énfasis suplido.) Art. 5 de la Ley Núm. 58, *supra*, 3 L.P.R.A. sec. 443c.

Para ese propósito se le confirió a dicho departamento las funciones siguientes:

(a) Defender activa y vigorosamente los derechos, la justicia y el bienestar general de la comunidad.

(b) *Fomentar la participación de la comunidad en los procesos electorales estadounidenses*.

(c) Auspiciar o realizar estudios e investigaciones sobre la comunidad puertorriqueña.

(d) Promover la divulgación del quehacer cultural de la comunidad y fomentar el contacto e intercambio cultural con la Isla.

(e) Colaborar con las organizaciones de la comunidad en su esfuerzo por orientar sobre la disponibilidad de servicios sociales esenciales y ofrecer asesoramiento sobre reclamaciones de violación de derechos, agravios e injusticias.

(f) Promover directamente, en colaboración con las organizaciones nacionales y locales de la comunidad, mayores oportunidades de educación y adiestramiento que capaciten a los puertorriqueños que entran en el mercado de trabajo.

(g) Ayudar a organizaciones y miembros de la comunidad puertorriqueña en el desarrollo de programas de promoción de pequeñas empresas comerciales.

(h) *Administrar los servicios prestados en los Estados Unidos por el Programa de Trabajadores Agrícolas en coordinación con el Departamento del Trabajo y Recursos Humanos*. (Énfasis suplido.) Art. 5 de la Ley Núm. 58, *supra*, 3 L.P.R.A. sec. 443c.

## II

*Antecedentes procesales*

El 17 de mayo de 1990 la representante a la Cámara por el Partido Nuevo Progresista, Hon. Zaida Hernández Torres, impugnó esta ley por infringir las Secs. 3 y 4 del Art. I,(1) y la Sec. 9 del Art. VI(2) de nuestra Constitución, *supra,* al disponer, respectivamente, la operación de ese Departmento Ejecutivo con oficina situada en *304 Park Avenue South, New York, New York 10010,* esto es, fuera de la sede de San Juan, y la asignación ilegal de fondos públicos.

Los demandados, honorable Hernández Colón *et al.,* comparecieron oportunamente. Tanto en instancia como ante nos, argumentan que el departamento ultramarino es constitucional porque la Ley Núm. 58, *supra,* no visualiza autoridad coercitiva, esto es, "no pretende imponer la autoridad política del Estado Libre Asociado fuera de nuestra jurisdicción". Aducen que la comunidad puertorriqueña en Estados Unidos no "tiene que obligatoriamente recurrir al Departamento para resolver sus problemas" y que el estatuto no invade la esfera de soberanía del estado de Nueva York.

En resumen, la posición de los demandados, honorables Hernández Colón y Velázquez, es que esta "controvertida legislación no constituye un ejercicio extraterritorial de la autoridad política del Estado Libre Asociado de Puerto Rico por cuanto no tiene la intención ni el alcance de invadir la soberanía federal,

---

(1) El Art. I, Secs. 3 y 4 de nuestra Constitución, L.P.R.A., Tomo 1, ed. 1982, pág. 256, dispone:

"*Sec. 3. [Área geográfica]*

"La autoridad política del Estado Libre Asociado de Puerto Rico se extenderá a la Isla de Puerto Rico y a las islas adyacentes dentro de su jurisdicción.

"*Sec. 4. [Sede del gobierno]*

"La sede de gobierno será la ciudad de San Juan Bautista de Puerto Rico."

(2) El Art. VI, Sec. 9 de nuestra Constitución, L.P.R.A., Tomo 1, ed. 1982, pág. 369, dispone:

"Sólo se dispondrá de las propiedades y fondos públicos para fines públicos y para el sostenimiento y funcionamiento de las instituciones del Estado, y en todo caso por autoridad de ley."

estatal o cualesquiera otras soberanías bajo la[s] cual[es] puedan estar situados los puertorriqueños residentes en Estados Unidos". Moción en Auxilio de Jurisdicción (Moción), pág. 3. Nos exponen, que "[l]uego de un extenso análisis de los tratadistas y jurisprudencia aplicable, ilustramos al Tribunal de Instancia en cuanto a que, si bien por definición un ente político funciona sobre una delimitada demarcación territorial y poblacional, no todo ejercicio que rebase dichas fronteras constituye en sí una extra-limitación impermisible de autoridad política. Se hizo énfasis en jurisprudencia estatal y federal que apuntaba que el concepto de extraterritorialidad conllevaba la invasión jurídica a otro cuerpo político mediante actuaciones extraterritoriales (o que repercutie-ran fuera de las fronteras de un estado) y que intentaran extender la facultad impositiva o coercitiva de un estado para velar por su política interna fuera de sus límites territoriales". Moción, pág. 3.

Respecto al planteamiento sobre la sede del Gobierno, sostie-nen que el concepto "no incluía a todos los departamentos ejecutivos, agencias, instrumentales u organismos del Gobierno de Puerto Rico." Moción, pág. 3. Limitan dicho concepto al sitio donde radican las oficinas principales del Gobernador, Cámaras Legislativas y Tribunal Supremo.

## III

*Fundamentos del tribunal de instancia*

En su elaborada sentencia, lo primero que el ilustrado foro de instancia observó de esta ley fue la contradicción o paradoja siguiente:

De acuerdo a su declaración de motivos y política pública, "no existe tal cosa como una comunidad puertorriqueña en los Estados Unidos como entidad separada y no incorporada a Puerto Rico." De ahí pues, la obligación de Puerto Rico de ayudar a los compatriotas que viven y se desempeñan "en la banda allá" que se encuentran marginados en los procesos sociales y económicos esenciales a su mejor bienestar. Para adelantar ese propósito el departamento ultramarino *deberá entre otras cosas fomentar la participación de*

*la comunidad en los procesos electorales estadounidenses o sea, promover la integración de la comunidad a la nación estadounidense. Ahí está la paradoja.*

La integración de la comunidad puertorriqueña a la nación es letal a las raíces que ésta tiene con Puerto Rico pues la misma indefectiblemente disminuye hasta hacerla [sic] desaparecer el sentimiento de nacionalidad puertorriqueña. Sería algo así como remover la corteza de un árbol: poco a poco el árbol dejará de echar hojas y se irá secando lentamente hasta morir. La mejor evidencia de esto lo [sic] vemos en los hijos de puertorriqueños nacidos allá tanto los de primera como segunda generación. Estos a pesar de los grandes esfuerzos que realizan por mantener y conservar su idioma y cultura terminan por perder el idioma español y el interés por los asuntos de Puerto Rico. Esto es así debido a que las fuerzas económicas los empujan a buscar nuevos modos de interpretar la realidad haciéndose parte de ésta integrándose a sus estilos de vida y de ganarse la vida. Lo único que los vincula a Puerto Rico es un hilo emocional o sentimental bien fino. *En la medida pues que el departamento ultramarino tenga éxito en integrar a la comunidad puertorriqueña a los procesos políticos de los Estados Unidos en esa misma medida se irá disolviendo el sentimiento nacional puertorriqueño.* (Énfasis suplido). Apéndice II, págs. 11–12.

Concluyó que el "Estado Libre Asociado de Puerto Rico es un cuerpo político unido a los Estados Unidos de América en una relación político-jurídica, *sui generis,* que carece de autonomía plena". Apéndice II, pág. 13. No goza de suficientes atributos de soberanía como para crear ese departamento ultramarino con "funciones de una embajada", para proteger a sus "nacionales" en Estados Unidos. Dicho departamento es incompatible con la peculiar relación político-jurídica prevaleciente.

Fundó su análisis en que con "la aprobación de nuestra Constitución en el año 1952, Puerto Rico advino al ejercicio de una soberanía similar a la de los estados de la Unión. *Puerto Rico v. The Shell Co.,* 302 U.S. 253, 263 (1937); *Examining Board of Engineers, Architects and Surveyors v. Flores de Otero,* 426 U.S. 572, 594; [49 L.] Ed.2d 65 (1976); *Córdova and Simonpietri v. The Chase Manhattan Bank,* 649 F.2d 36 (1er Cir. [1981]); *El Pueblo v. Castro García,* [120 D.P.R. 740 (1988)]". (Escolio omitido.) Apéndice II, pág. 14.

Interpretó que el concepto de *autoridad política* previsto en la Sec. 3 del Art. I de nuestra Constitución, *supra,* era sinónimo de *police power* o "poder de razón de estado", expositivo de "los poderes que se reservan los estados PARA REGLAMENTAR LOS ASUNTOS INTERNOS en protección o fomento de la salud, la seguridad y la moral, o en términos más amplios del bienestar público. *R.C.A. v. Gobierno de la Capital,* 91 D.P.R. 416, 428 (1964)". (Énfasis suplido.) Apéndice II, pág. 16. Sujetó el ejercicio de ese poder a "criterios de razonabilidad". Apéndice, pág. 17. Véanse, además: *E.L.A. v. Rodríguez,* 103 D.P.R. 636, 640 (1975); *The Richards Group v. Junta de Planificación,* 108 D.P.R. 23 (1978).

En su dictamen, el foro de instancia formuló los siguientes principios elementales en el orden constitucional: (*a*) "que las leyes de todo país son *territoriales* y que más allá de su territorio solamente pueden afectar a sus ciudadanos"; (*b*) que las "leyes de un estado son consideradas leyes extranjeras en otro estado"; (*c*) que un "estado no adquiere poder o puede supervisar los asuntos internos de otro estado por el mero hecho de que la salud o el bienestar de sus ciudadanos pueda verse afectado al éstos viajar a dicho estado. *Bigelow v. Virginia,* 421 U.S. 809; 44 L. Ed. 600 (1975)"; (*d*) que la extraterritorialidad —"operación de leyes sobre personas, derechos o relaciones jurídicas más allá de las fronteras físicas del estado o del país que las promulga"— sólo se sanciona "cuando ésta se hace sobre sus ciudadanos", y (*e*) "sólo regirá en los límites territoriales de su estado y que una ley de un estado es extraña en otro estado". Apéndice II, págs. 17–19.

En su análisis, el tribunal descartó el *elemento coercitivo* en la legislación como requisito decisivo e intrínseco a la extraterritorialidad. El "principio fundamental es el que informa que las leyes de todo país son territoriales y más allá de los límites geográficos del territorio solamente puede afectar a los ciudadanos del país que la[s] promulgó . . . el meollo de toda legislación extraterritorial es, como ha dicho nuestro Tribunal Supremo, *la invasión que ésta conlleva en la soberanía jurídica de otro cuerpo político.* Independientemente de que dicha invasión conlleve coerción o no,

si se da la mencionada invasión estaremos ante una legislación extraterritorial. *Inter Island Ship Corp. v. Comisión Industrial,* 89 D.P.R. 648 (1963)]". (Énfasis suplido.) Apéndice II, págs. 21–22.

Luego de reconocer que la Ley Núm. 58, *supra,* carecía del elemento coercitivo —no impone ningún deber afirmativo a la ciudadanía o al estado de Nueva York, ni le exige que inicie una campaña de inscripción a favor de los puertorriqueños allí domiciliados— determinó que la misma constituía una invasión a la soberanía jurídica de este estado en el aspecto de organizar sus procesos electorales.

Por su importancia, inteligencia y juridicidad transcribimos el razonamiento del reputado juez de instancia:

> *Uno de esos servicios públicos esenciales en un sistema democrático es el proceso electoral. . . . Es decir, que todo lo relacionado con la organización, ejecución y elección de los gobernantes, las estructuras de poder y los gobernados es asunto que sólo le concierne a los gobernados, con exclusión de toda otra persona.* Acorde con esta teoría, un cuerpo político extraño no puede intervenir en las relaciones jurídicas entre gobernantes y gobernados, para organizar un sector de éstos de determinada manera para que participen [sic] en el proceso de la elección de aquéllos. *Esto sería una intromisión indebida en la soberanía política y jurídica de la comunidad política intervenida.*
>
> El Estado Libre Asociado de Puerto Rico, a través de la legislación de marras, quiere fomentar y facilitar que un grupo específico de ciudadanos de New York se inscriba y participe en el proceso electoral de ese estado. Determinamos que eso constituye una invasión impermisible de la soberanía de New York. La asignación y uso de fondos públicos para tales fines infringe la Sección 9 del Artículo VI y la Sección 19 del Artículo II de nuestra Carta fundamental por no constituir un uso de fondos "para fines públicos" *y por no beneficiar en nada ese uso el bienestar del pueblo de Puerto Rico: a los ciudadanos de Puerto Rico.* En otras palabras, no existe un propósito genuino de razón de Estado. *P.S.P. v. E.L.A.,* 107 D.P.R. 590 (1978); *P.I.P. v. C.E.E.,* [120 D.P.R. 580] (1988). *La organización del sistema electoral de New York es un asunto que le compete únicamente al estado de New York que es a quien sus ciudadanos le confirieron la autoridad política para hacerlo. Es dicho estado quien tiene que tomar acción afirmativa para que sus ciudadanos se inscriban y participen del proceso electoral.*

Esta incursión en la esfera política neoyorkina o en la de cualquier otro estado o ciudad ocasiona o puede ocasionar inevitablemente fricciones de carácter faccioso entre entes políticos que se agrupan bajo la esfera de la soberanía de los Estados Unidos de América. La Constitución de 1787 quiso evitar a cualquier costa cualquier medio de fricciones entre estados y añadiríamos entre territorios. Si no queremos ver invadida nuestra limitada esfera de autoridad política dentro del Estado Libre Asociado no debemos extenderle una invitación a esos otros entes políticos promoviendo participaciones electorales en elecciones internas de otros entes políticos. El sufragio es la manera de canalizar la voluntad de los ciudadanos para la consecución de sus *intereses comunales*. . . . La ley impugnada atenta contra la esencia misma de la democracia representativa al intervenir indebidamente [vigorosa campaña de inscripción de puertorriqueños residentes en New York] en el proceso político de los Estados Unidos y sus estados. . . . De igual forma no puede reconocerse como válida esta legislación sin que tal reconocimiento represente una invasión injustificada de la soberanía política y jurídica del estado de New York. Corresponde al estado de New York implantar y desarrollar su política pública en torno al proceso electoral. No podemos imaginarnos que esa política pública le reconozca a un cuerpo político extraño autoridad política para que intervenga en una o varias fases del proceso electoral neoyorkino. (Énfasis suplido y escolio omitido.) Apéndice II, págs. 24-27.

Respecto al planteamiento de la sede del Gobierno —Art. I, Sec. 4, Const. E.L.A., *supra*,— el foro de instancia concluyó como "hecho indisputable y determinante . . . que el lugar real de la sede de dicho departamento [es] donde reside y trabaja la Secretaria que lo dirige, Hon. Nydia I. Velázquez, y los empleados que laboran en el mismo . . . 304 Park Avenue, New York, N.Y., 10010". Apéndice II, pág. 31.

Al evaluar la alegación de los demandados, honorable Hernández Colón *et al.*, de que "sería totalmente absurdo sostener que las oficinas principales o subsidiarias del Departamento de Asuntos de la Comunidad puertorriqueña en los Estados Unidos tienen que establecerse por mandato constitucional en San Juan cuando precisamente la función de ese departamento es atender las necesidades de las comunidades puertorriqueñas en

New York, Philadelphia, Chicago, Boston y otras ciudades en los Estados Unidos donde viven, trabajan y sufren más de tres millones de puertorriqueños" (Apéndice II, pág. 33), el juez de instancia expuso así el vicio e impedimento constitucional:

Lo que verdaderamente ocurre es que resulta totalmente extraño dentro de nuestro esquema constitucional un departamento ejecutivo con rango a nivel de gabinete dirigido por un Secretario del Gobierno con una sede fuera de los límites territoriales del gobierno de Puerto Rico. *Los constituyentes jamás pensaron en tal cosa.*

El Departamento ultramarino también presenta la dificultad de que sus operaciones fiscales caen fuera del alcance de la mano del Contralor. Esto es constitucionalmente impermisible. (Énfasis suplido.) Apéndice II, pág. 33.

Finalmente, concluyó que el "establecimiento de ese Departamento con funciones de embajada también resulta sumamente extraño en la especial relación político-jurídica que existe entre Puerto Rico y los Estados Unidos". Apéndice II, págs. 34–35. Sentenció:

La realidad es que los puertorriqueños que optaron por trasladarse a vivir a los Estados Unidos el lugar de *su destino está allá y no acá. Es allá donde ellos viven, trabajan, pagan contribuciones, eligen (votan) a sus gobernantes, educan a sus hijos y en fin donde hacen su vida.* Los hijos de los puertorrique-ños que nacen y se crían allá apenas saben hablar español y es muy poco lo que conocen de Puerto Rico.

Dentro del marco de nuestra relación política con los Estados Unidos a quien le corresponden las anteriores funciones lo es *a las ciudades y estados en donde residen los puertorriqueños en Estados Unidos.* La acción afirmativa para el logro de esas metas compete al Estado y no a Puerto Rico. En lo que respecta al estado de New York, allá los puertorriqueños cuentan con los Reptes. José Serrano, Charles Rangel y Bill Green, etc.; los Senadores Alfonse D'Amato y Daniel Patrick Moynihan, el Gov. Mario Cuomo y el Alcalde David Dinkins. *Estos son sus gobernantes y no el Estado Libre Asociado de Puerto Rico.*

Bajo el sistema federativo estadounidense sería totalmente impermisible una oficina de Asuntos de la Comunidad Neoyorkina

en el Estado de Georgia para defender los intereses de los ciudadanos de New York en dicho lugar. Sería impermisible debido a que en los Estados Unidos no existe tal cosa como los nacionales de New York, de Florida, etc. Allí sólo existe como expresáramos con anterioridad una sola nacionalidad: *la nacionalidad estadounidense y tan pronto un ciudadano de un estado se muda a otro se convierte en ciudadano del estado al que se mudó. Lo mismo sucede con los puertorriqueños que se trasladan a vivir allá. Estos se convierten en ciudadanos del estado donde viven y hacen su vida.* (Énfasis suplido.) Apéndice II, págs. 36–37.

## IV

*Análisis y conclusión de inconstitucionalidad*

Si bien estamos contestes con gran parte del análisis del respetable juez de instancia, no podemos suscribir algunos planteamientos sobre los conceptos de nacionalidad y ciudadanía. Aunque nos es imposible abundar sobre este particular en este momento, remitimos a las partes y a los lectores a nuestra opinión disidente en *De Paz Lisk v. Aponte Roque,* 124 D.P.R. 472 (1989).

No obstante, coincidimos con el tribunal de instancia en que el Art. 5(b) de la Ley Núm. 58, *supra,* 3 L.P.R.A. sec. 443c(b), es inconstitucional e invade la soberanía jurídica y política de los estados. El propósito y función de "fomentar la participación de la comunidad en los procesos electorales estadounidenses" claramente infringe el ámbito geográfico jurisdiccional del Gobierno de Puerto Rico. Art. I, Sec. 3, Const. E.L.A., *supra.*

Es que, en buena teoría, la ciudadanía (domicilio) en Puerto Rico y en los estados norteamericanos se da en función de la intención de establecerse allí, unido a la residencia. Véase *Fiddler v. Srio. de Hacienda,* 85 D.P.R. 316 (1962). Esa realidad es la que establece el nexo racional de responsabilidad recíproca entre los gobernantes y el electorado. Ausente la misma, sólo tenemos sentimientos que, si bien hermosos y nobles, son incapaces de generar un vínculo jurídico. Y es que el requisito legal de residencia que presupone la inscripción de un elector en un estado derrota *ex proprio vigore* la constitucionalidad del Gobierno de

Puerto Rico al promover y desembolsar válidamente fondos públicos en inscripciones en los procesos electorales de los estados.

Según hemos visto, la declaración de propósitos de la Ley Núm. 58, *supra,* afirma la imposición de un deber de "fortalecer nuestro compromiso de ayudar a los compatriotas que viven y se desempeñan en Estados Unidos . . .". El "deber" antes mencionado responde a una conceptualización unitaria de la comunidad puertorriqueña, con propósitos que se justifican en una esfera sociopolítica pero que son totalmente inadecuados en la esfera jurídica.

En Derecho, el concepto "ciudadanía" es función de su acepción jurídica y no de su significado sociopolítico. Por esta razón, cualquier pieza legislativa que pretenda beneficiar ciudadanos de Puerto Rico tiene que limitarse a aquellas personas bajo la jurisdicción del Estado Libre Asociado.

Anteriormente hemos señalado que la ciudadanía corresponde al domicilio y éste, a su vez, depende del *animus manendi* unido a la presencia física. *González v. Secretario de Hacienda,* 76 D.P.R. 135, 141 (1954); *Fiddler v. Srio. de Hacienda,* supra. Como consecuencia, no sería susceptible de debate serio e inteligente afirmar que un ciudadano de Puerto Rico que cambia su domicilio al mudarse a otro estado no pierde su *status* como ciudadano de Puerto Rico. *Tes. v. Tribl. Contribuciones y Solé,* 69 D.P.R. 905 (1949).

Nuestra Constitución es indudablemente un "convenio acordado entre el pueblo de Puerto Rico y los Estados Unidos de América". Art. I, Sec. 1, *supra,* ed. 1982, pág. 252. No debemos trascender sus límites y considerar el concepto "pueblo" allí esbozado como inclusivo de todo aquel albergado bajo el concepto "pueblo" (*people*) de la Constitución de Estados Unidos de América. Véase *United States v. Verdugo-Urquidez,* 108 L. Ed. 2d 222 (1990). El Gobierno de Puerto Rico no se debe a otro grupo que no sea aquella "clase de personas que son parte de una comunidad o quienes de otra forma han desarrollado contactos suficientes con [Puerto Rico] para que se les considere parte de

·esta comunidad". (Traducción nuestra.) *United States v. Verdugo-Urquidez*, supra, pág. 233. Véase, además, *Turner v. Williams*, 194 U.S. 279, 292 (1904).

Toda vez que *jurídicamente* los miembros de la "comunidad puertorriqueña en Estados Unidos" no son ciudadanos de Puerto Rico, el Estado Libre Asociado no tiene deber jurídico alguno para con ellos. Los beneficios directos e indirectos que el programa de participación electoral puede generar no avalan su constitucionalidad. Resolver lo contrario afecta seriamente la soberanía de los demás estados y para todos los efectos prácticos conllevaría la extensión de nuestro territorio a distintos sectores en los Estados Unidos. Más allá del ámbito sociológico, la cultura no es y nunca ha sido un elemento a considerar para determinar la ciudadanía.

En cuanto a la ausencia de sede principal en San Juan de ese departamento ultramarino, no creemos que ello necesariamente viole el Art. I, Sec. 4 de la Constitución, *supra*. Es que el nombre no hace la cosa. Más allá de su etiqueta de "departamento con rango a nivel de gabinete", las restantes funciones son legítimas. A igual conclusión arribamos sobre el fundamento relativo a la intervención de la Oficina del Contralor. Ninguno de estos dos (2), a juicio nuestro, lesiona constitucionalmente el estatuto.

Únicamente el uso de fondos públicos para fomentar la participación electoral es contrario al Art. VI, Sec. 9 y al Art. II, Sec. 19 de nuestra Constitución, L.P.R.A., Tomo 1. En ese extremo estamos ante una legislación impermisible dentro del marco político-jurídico prevaleciente entre Puerto Rico y Estados Unidos. En consecuencia, confirmaríamos en ese aspecto al Tribunal Superior, Sala de San Juan. Los demás servicios prestados por el llamado Departamento de Asuntos de la Comunidad Puertorriqueña en los Estados Unidos —que redundan en beneficios para los ciudadanos de Puerto Rico— no llevan en sí el germen de inconstitucionalidad.

Para evitar el dispendio ilegal de fondos públicos, mantendríamos el *injunction permanente* contra la Secretaria del Departamento de Asuntos de la Comunidad Puertorriqueña en los

Estados Unidos, Hon. Nydia I. Velázquez, sus sucesores en el cargo y los empleados de ese departamento. Les prohibiríamos llevar a cabo la función, por cualesquiera medios, de "fomentar la participación de la comunidad en los procesos electorales estadounidenses". Así modificada, confirmaríamos la sentencia.

Toda esta controversia nos recuerda el siguiente pensamiento de Ortega y Gasset:

> La política puede significar dos cosas: arte de gobernar o *arte de conseguir el Gobierno y conservarlo*. De otro modo: hay *arte de legislar y un arte de imponer cierta legislación*. Pensar qué ley es la más discreta en cada caso y pensar qué medio habría para hacer que esa ley llegue a convertirse en ley escrita y vigente, son cuestiones muy distintas, *pero es menester repetir a toda hora que es un acto inmoral convertirse en conquistador del poder sin crearse previamente un ideal gubernativo*. Cierto: política es acción, pero la acción es también movimiento, es ir de un lugar a otro, es dar un paso, y un paso exige una dirección que vaya recta hasta lo infinito. *Entre nosotros se ha hecho una separación indebida de la política de acción y la política ideal, como si la una tuviera sentido huérfana de la otra. La historia contemporánea de nuestro país ha hecho patente hasta qué punto de miseria puede llegar una política activa exenta de ideal político.* (Énfasis suplido.) J. Ortega y Gasset, *Discurso Político,* Madrid, Ed. Alianza S.A., 1974, pág. 45.

El factor tiempo nos ha obligado a limitar sustancialmente los fundamentos en abono de esta posición. Para hacer *justicia,* habrá después una nueva oportunidad.